697 F.2d 97
 Sanford M. NOBEL and Carol Nobel Hirsh, t/a Menallen Coke
Company of New Salem, Appellants,
v.
T.J. MORCHESKY and Johnstown Bank and Trust Company,
Administrators of the Estate of James A. Morchesky, Kenneth
Morchesky, Better Mining Company, Inc., Charles W. Dahl and
Mary O. Dahl, his wife, Appellees.
 No. 82-5254.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 30, 1982.
Decided Dec. 29, 1982.
 
 E. Barclay Cale, Jr. (argued), John G. Rainey, Jr., Philadelphia, Pa., for appellants; Morgan, Lewis & Bockius, Philadelphia, Pa., of counsel.
 Gary C. Horner (argued), Spence, Custer, Saylor, Wolfe & Rose, Robert A. Webster (argued) Johnstown, Pa., for appellees.
 Before ALDISERT and HIGGINBOTHAM, Circuit Judges, and SAROKIN, District Judge.*
 OPINION OF THE COURT
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 PROCEEDING BELOW
 
 1
 This action was initiated in the United States District Court for the Western District of Pennsylvania by Sanford M. Nobel and Carol Nobel Hirsh, trading as Menallen Coke Company of New Salem ("Menallen"), seeking damages for the wrongful taking of coal. Defendants filed a Motion to Dismiss asserting, inter alia, the lack of diversity between the parties. The Honorable Daniel J. Snyder, Jr. denied defendants' motion.
 
 
 2
 Following a nonjury trial Judge Snyder took the case under advisement, but he died before entering findings of fact and conclusions of law. The parties agreed that the case be submitted to a substitute judge for decision on the record developed at trial. Subsequently, the Honorable Paul A. Simmons was assigned to decide the case.
 
 
 3
 Judge Simmons made a preliminary statement in which he expressed his inability to determine whether the court had proper diversity jurisdiction over the matter although the late Judge Snyder already had found diversity jurisdiction. Despite the absence of substantially different evidence than that already considered by Judge Snyder, Judge Simmons reopened the case and ordered the parties to produce documents relating to the partnership and the prior state court action in order to decide again the issue of jurisdiction.
 
 
 4
 During a hearing held on October 30, 1981, these documents were received in evidence and testimony was taken from Max Nobel, a 77-year-old retired general partner of Menallen. Subsequently, plaintiffs' case was dismissed with prejudice for lack of jurisdiction and other inadequacies. We disagree with the district court's ruling on all of the issues and will reverse.
 
 FACTS
 
 5
 This case concerns competing claims to title to the coal ("the Dumbauld Coal") underlying two areas of land owned by William and Mary Dumbauld. The parties stipulated that Max and Helen Nobel had acted as straw parties in acquiring the disputed coal for Menallen by deed dated December 18, 1973. The purchase was made using Menallen's funds and was reflected on Menallen's books. In addition, Menallen later paid approximately $40,000 in back taxes on the coal interest.
 
 
 6
 In late July, 1977, it was discovered that the Dumbauld Coal was being removed. Max Nobel immediately filed suit in the Fayette County Court against James Morchesky, a Pennsylvania resident, and Better Mining Company, Inc. ("Better Mining"), a Pennsylvania corporation, seeking an injunction against any further removal of coal and damages for the coal already removed. Max and Helen Nobel, in whose name record title was held, were the named plaintiffs in the state court action.
 
 
 7
 In attempting to resolve the dispute the parties agreed that defendants would pay a royalty of $2.00 per ton for coal already removed. Additionally, the parties agreed that defendants would refrain from further removal of the Dumbauld Coal except for a small triangle of land where mining operations were already in progress.
 
 
 8
 The parties informed the Fayette County Court of their agreement in a hearing on October 5, 1977. The court, after the hearing and on stipulation of the parties, enjoined James Morchesky and Better Mining from further mining operations of the disputed coal. The Order was entered without prejudice. Notwithstanding the purported agreement, coal continued to be removed (by the parties).
 
 
 9
 On May 5, 1978, Max and Helen Nobel transferred their record title to the Dumbauld Coal to Menallen, the erstwhile equitable owner.[1] On May 22, 1978 Max Nobel, at the age of 74, resigned from Menallen. He was Menallen's only Pennsylvania resident. He testified that he resigned because he had suffered a stroke about two months earlier which required eight days of hospitalization, five days of which required intensive care. Max Nobel also indicated that he resigned as a general partner to reduce his worries and work responsibilities.
 
 
 10
 Max Nobel was paid his entire interest in Menallen, over $400,000, after he signed his letter of resignation. His resignation was complete and unconditional. He neither retained nor reacquired an ownership interest in Menallen. The remaining general partners, each of whom is a New York resident, later signed and filed with the Department of State a Certificate of Summary of Record and Amended Certificate of Limited Partnership indicating the change in partnership in order to continue the business of Menallen.
 
 
 11
 Also on May 22, 1978, before trial had begun in the Fayette County action, plaintiffs filed a Praecipe for Discontinuance with the Prothonotary. The state action was marked discontinued and defendants never petitioned to "strike off" the discontinuance.
 
 
 12
 For the reasons set forth in detail below we will reverse the district court as follows: First, we conclude that the district court erred in holding that Max Nobel was required to sign the amended certificate of limited partnership under Pennsylvania's Limited Partnership Act in order to retire from Menallen. In addition we conclude that the remaining general partners properly continued the business of Menallen. These conclusions will be discussed in Part I of this opinion. Second, we find that the district court was clearly erroneous in concluding that Max Nobel did not retire as a matter of fact. We will discuss this finding in Part II. Third, we hold that, in the absence of a final judgment or final order of dismissal with prejudice, the district court should not have found the doctrine of res judicata a bar to the present action. This holding will be explained in Part III. We find that Menallen as present legal owner and erstwhile equitable owner of the disputed coal has standing to maintain the present action. We will discuss this finding in Part IV. Finally, we conclude that the lower court was clearly erroneous in its determination that none of the disputed coal was mined after May 5, 1978.
 
 I.
 
 13
 The district court erred in concluding that Max Nobel, a purported retired general partner, was required to sign Menallen's amended certificate of limited partnership in order for him to be considered retired and for that certificate to be considered valid under Pennsylvania's Limited Partnership Act ("The Act"). 59 Pa.Cons.Stat. Secs. 501 et seq. (1975).
 
 
 14
 The Act governs the activities of persons desiring to form limited partnerships as well as members of limited partnerships. Members of limited partnerships include both general and limited partners. Section 534, entitled the "Effect of retirement, death, or insanity of a general partner," states that unless the business is continued by the remaining general partners, the retirement, death, or insanity of a general partner dissolves the partnership. Id. Sec. 534.[2] The Act sets out the procedure to be followed by remaining general partners in order for them to continue their business on the occurrence of one of these events. Id. Secs. 542(b)(5), 543(a), 543(d).
 
 
 15
 Specifically, sections 542(b)(5) and 543 require that the remaining general partners amend a certificate of limited partnership in order to continue the business.[3] Section 543 provides the requirements for amending a certificate of limited partnership. It states that "[t]he writing to amend a certificate shall: ... [c]onform to the requirements of section 512(a)(1) (relating to formation), as far as necessary to set forth clearly the change in the certificate it is desired to make," ... [b]e signed by all members ..., "id. Sec. 543(a)(2), and be filed with the Department of State." 59 Pa.Cons.Stat. Secs. 543(a)(1), (2), 543(c)(2).
 
 
 16
 In the instant case Menallen wished to indicate that Max Nobel was no longer one of its general partners. To that end the limited partners and remaining general partners of Menallen signed and filed a Certificate of Summary of Record and an Amended Certificate of Limited Partnership with the Department of State in order to continue the business of Menallen. Exhibit Volume ("Supp.App.") EV-79-81, EV-89-93. Both documents set forth clearly the change in the membership of Menallen by excluding Max Nobel's name from the partnership list. Id. EV-80-81, EV-90, EV-92-93.
 
 
 17
 However, in applying Section 543(a)(2), which requires that a writing to amend a certificate be signed by all members, to the instant case the lower court wrongly concluded that "Max Nobel, as a general partner of the limited partnership, was required ... to sign the amendment to the certificate of limited partnership, which purported to evidence his retirement from said partnership." Nobel v. Morchesky, 535 F.Supp. 218, 222 (W.D.Pa.1982). Because the amended certificate of limited partnership was not signed by Max Nobel, the District Court found that the certificate was not signed by all members as required by Sec. 543(a)(2) and that Max Nobel's resignation was ineffective as a matter of law. It concluded that Max Nobel continued to be a general partner and therefore found diversity absent. Id.
 
 
 18
 This court disagrees with the lower court's analysis of the Act and with the conclusion.
 
 
 19
 The Act simply does not speak to the prerequisites essential to considering a general partner retired, just as it does not speak to the prerequisites essential to considering a person dead or insane. It is, however, patently obvious that the death or insanity of a general partner can occur without benefit of the Act and without signing an amended certificate of limited partnership.[4]
 
 
 20
 In the instant case no substantive reason exists to distinguish the effect of either the retirement, death or insanity of a general partner under the Act. Indeed, the three types of terminations are housed in the same section of the Act. 59 Pa.Cons.Stat. Sec. 534. Moreover, the retirement, death, or insanity of a general partner each brings about the same result. Each event ends that individual's ownership interest in the limited partnership. As far as the Act is concerned, that individual ceases to be a member of the limited partnership.[5] Therefore, because Max Nobel's retirement terminated his status as a general partner and a member of Menallen, he was not required to sign an amended certificate of limited partnership.
 
 
 21
 For the above reasons the district court erred as a matter of law in interpreting the Act to require Max Nobel's signature on the amended certificate of limited partnership in order for him to be considered retired and the partnership continued.
 
 II.
 
 22
 In this part we expand our analysis and consider whether Max Nobel in fact retired from Menallen. The district court called Max Nobel's resignation and Menallen's amended certificate of partnership "a conspiracy ... to try to formulate facts which would support federal jurisdiction." Appendix ("App.") A-154. It concluded that Max Nobel's alleged motive for retiring, to create diversity jurisdiction, proved that his resignation was collusively obtained or a sham. We disagree. Unless a consideration of all of the evidence indicates that Max Nobel's resignation was collusively obtained or was a sham, Max Nobel's letter of resignation removed him as a general partner from Menallen for purposes of diversity jurisdiction.
 
 
 23
 In finding that Max Nobel's actions were a collusive attempt to create federal jurisdiction, the district court relied on two points: first, the inability of Menallen to maintain the present action in federal court without Max Nobel's resignation;[6] and second, Max Nobel's alleged sworn testimony that he sought to resign from Menallen to create diversity jurisdiction. Nobel v. Morchesky, 535 F.Supp. at 223.
 
 
 24
 The lower court's finding of collusion is, however, simply unsupported by the evidence and is clearly erroneous. Max Nobel never testified that he sought to resign from Menallen in order to create diversity jurisdiction. Id. A-196-97, A-202-03.[7] Indeed, Max Nobel testified to the contrary. Id. A-202-03.
 
 
 25
 However, even if Max Nobel's resignation were motivated by a desire to get into federal court, that motivation does not demonstrate collusion or a sham where valuable consideration was properly given for his entire ownership interest and where his Resignation was final and unconditional.
 
 
 26
 For example, in Cross v. Allen, 141 U.S. 528, 533, 12 S.Ct. 67, 69, 35 L.Ed. 843 (1891), plaintiff transferred notes and mortgages to a non-resident of the state for valuable consideration and stated that one of the purposes of the transfer was to create diversity jurisdiction. Id. The Supreme Court held that the lower court erred in finding the transfer was not bona fide because of plaintiff's motive. If the transferor retains no interest in the subject matter and the transfer is unconditional, the transfer is not improper or collusive even if motivated by a desire to create diversity. See Kramer v. Caribbean Mills, Inc., 394 U.S. 823, 828 n. 9, 89 S.Ct. 1487, 1490 n. 9, 23 L.Ed.2d 9 (1969).
 
 
 27
 As Appellant in the instant case points out:
 
 
 28
 this situation can be compared to cases where an individual or corporation changes its State of residence or incorporation for the purposes of creating diversity. Even if the sole motive of such a move is the creation of diversity, jurisdiction is valid if the change of citizenship is actual and not temporary or illusory. Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab & Transfer Co., 276 U.S. 518, 48 S.Ct. 404, 72 L.Ed. 681 (1928) ... 14 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure Sec. 3638 (1976).
 
 
 29
 Appellants' brief at 12.
 
 
 30
 Moreover, all of the evidence bearing on Max Nobel's motive for retiring demonstrates that his resignation was legitimate and proper. The 74-year-old Max Nobel testified that his sole purpose for resigning from Menallen was to retire. His reason for retiring centered on a severe stroke he had suffered a few months before which required eight days of hospital care, including five days of intensive care. He is still required to take medication for his coronary condition. App. A-202-03. He offered uncontradicted testimony that he now has fewer responsibilities as a manager in Menallen. He escapes the worries of some of the decisionmaking; he is able to take 1 1/2 hours' rest during the lunch period; and he was able to "ease up" generally. App. A-203.
 
 
 31
 Moreover, Max Nobel received substantial consideration from partnership funds, approximately $400,000, in exchange for his entire partnership interest. App. A-190-91. Although he continued to work at Menallen as a manager, he retained no ownership interest therein. Id., at A-193.
 
 
 32
 In short, the district court was clearly erroneous in concluding that Max Nobel's resignation was a collusive attempt to establish diversity jurisdiction or a sham. The evidence does not support that conclusion. Even if Max Nobel's primary motive was to create diversity jurisdiction, though all of the evidence is to the contrary, collusion is not established where, as here, the retired general partner maintains no ownership interest in the partnership, receives $400,000 in return for his entire partnership interest, is 74 years old and suffers physical ailments.
 
 III.
 
 33
 The district court also erred in concluding that a prior state court action, Max Nobel et al. v. James Morchesky, et al., No. 2992, Court of Common Pleas of Fayette County, Pennsylvania (Filed August 2, 1977), precludes Menallen from maintaining the present federal court action because of the doctrine of res judicata. Under Pennsylvania law, a final judgment on the merits of a prior case is a necessary prerequisite to the application of the doctrine of res judicata. Posternack v. American Casualty Co. of Reading, 421 Pa. 21, 24, 218 A.2d 350 (1966).
 
 
 34
 In the present case, however, there has been no final order or judgment by the Fayette County Court. The prior state court action was voluntarily discontinued by plaintiffs with the filing of an unchallenged Praecipe for Discontinuance with the Prothonotary before the commencement of trial as provided by Rule 229 of Pennsylvania's Rules of Civil Procedure. 1 Goodrich-Amram 2d Sec. 229(a):2 (1976).[8] Prior court approval is not required to discontinue an action. See Id. Sec. 229(A):6. Therefore, in the absence of a final judgment or final order of dismissal with prejudice, the district court erred in finding res judicata a bar to the present action.
 
 IV.
 
 35
 The district court also erred in concluding that "the limited partnership has no title to the cause of action in the present case, and [the district court] would have no subject matter jurisdiction even assuming the existence of diversity jurisdiction...." Nobel v. Morchesky, 535 F.Supp. at 224. Under Pennsylvania law it is well settled that an equitable holder of title may bring an action for trespass. Miller v. Zufall, 113 Pa. 317, 326, 6 A. 350 (1886).[9] Pennsylvania considers the person or entity "whose funds are used for the purchase of real property the equitable owner of the property." See McHenry v. Stapleton, 443 Pa. 186, 278 A.2d 892 (1971); Beringer v. Lutz, 188 Pa. 364, 41 A. 643 (1898).
 
 
 36
 In the present case $8,800 of Menallen's partnership funds were used to purchase the disputed coal. App. A-177-78.[10] An additional $40,000 of Menallen's partnership funds paid township, county and school taxes on the coal. Id. A-178-79. Finally, all of these expenditures were recorded in Menallen's accounting books and were reflected as a partnership capital investment. Id. A-177-79.
 
 
 37
 Therefore Menallen must be considered the equitable owner of title to the Dumbauld Coal at the time of the wrongful takings. As equitable owner of the Dumbauld Coal, Menallen may maintain this action challenging the alleged wrongful removal of its coal. The district court's holding that Menallen lacked the proper standing to sue is clearly erroneous.
 
 V.
 
 38
 The district court's factual finding that no coal was mined by Better Mining Company on the Dahl property on and after May 5, 1978 is clearly erroneous. There is no evidence in the record supporting the lower court's factual finding. Max Nobel testified that Better Mining was still removing coal in May of 1978, and his testimony is buttressed by Exhibit P-35B, a map prepared by Better Mining itself, showing the progress of mining operations as of May, 1978. App. A-108-15. Specifically, the map demonstrates that mining operations on the Dahl property had not yet been completed. App. A-108-15, A-120-26. This evidence is undisputed.
 
 
 39
 Therefore, this court must conclude that because the district court arbitrarily selected the May 5th termination date it must be set aside.
 
 
 40
 For the foregoing reasons,[11] we will reverse the judgment of the district court.
 
 
 
 *
 Honorable H. Lee Sarokin, of the United States District Court for the District of New Jersey, sitting by designation
 
 
 [1]
 See note 9, infra
 
 
 [2]
 However, neither section 534 nor any other section indicates how one effectuates or proves his/her retirement
 
 
 [3]
 Section 542(b)(5) states that "[a] certificate shall be amended when: ... [a] general partner retires, dies, or becomes insane, and the business is continued under section 534...." 59 Pa.Cons.Stat. Sec. 542(b)(5). Section 534 states: "The retirement, death, or insanity of a general partner dissolves the partnership, unless the business is continued by the remaining general partners...." Id. Sec. 534
 
 
 [4]
 Certainly the lower court would not suggest that if a dead or insane person neglects to sign an amended certificate of limited partnership, that person remains a general partner
 
 
 [5]
 That the limited partnership dissolves unless it is continued by the remaining general partners supports this conclusion. See 59 Pa.Cons.Stat. Sec. 534
 
 
 [6]
 In the instant case Max Nobel executed and signed a letter of resignation from Menallen on May 21, 1978. Supp.App. EV-106. The letter was notarized on May 22, 1978. Id. EV-107
 
 
 [7]
 Max Nobel never testified to anything regarding the issue of diversity beyond the fact that his attorney informed him that since Max had resigned, Menallen could go to federal court. Id. A-196-97, A-202-03. From this the lower court judge inferred that Max Nobel resigned to create diversity
 
 
 [8]
 The District Court suggests that settlement agreements can act as res judicata to later actions. Nobel v. Morchesky, 535 F.Supp. at 224. A bar to later actions can occur however, only where the Court terminates the action with prejudice. Bearoff v. Bearoff Brothers, Inc., 458 Pa. 494, 498, 327 A.2d 72 (1974)
 
 
 [9]
 The parties stipulated that Max and Helen Nobel acted as straw parties in behalf of Menallen in acquiring the disputed coal interests. By Deed dated December 28, 1973, John E. Reynolds, successor receiver for Sagamore Coal Company, conveyed inter alia, all of the Dumbauld coal to Max Nobel and Helen Nobel, his wife, as straw parties for Menallen Coke Company of New Salem, the plaintiff herein.... App. A-58
 
 
 [10]
 There is no evidence that Max and Helen Nobel used any of their personal funds to acquire the disputed coal interests
 
 
 [11]
 We are aware of appellants' request that this case be reassigned to a different judge on remand. While we do have authority under our supervisory powers to reassign cases to " 'avoid even the appearance of bias,' " see Lewis v. Curtis, 671 F.2d 779, 789 (3d Cir.1982), such mandatory reassignments should be made infrequently and with the greatest reluctance. Certainly, it is not without significance that the issue of the mandatory reassignment of this case from Judge Simmons appears as an afterthought. Indeed, because counsel neither raised this issue with the trial judge nor raised it in his original brief, we are not inclined to grant the relief requested; however, we express no opinion as to whether the trial judge should or should not recuse himself