**John J. McLAUGHLIN and Marilyn M. McLaughlin**

v.

**Irene PERNSLEY, Commissioner and City of Philadelphia Department of Human Services.**

**Civ. A. No. 86–7143.**

United States District Court, E.D. Pennsylvania.

March 10, 1987.

---

Michael Churchill, Judith A. Gran, Philadelphia, Pa., for plaintiffs.

Stacey Meadows, Chief Asst. City Sol., Handsel B. Minyard, City Sol., Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

HANNUM, Senior District Judge.

In the present action, the plaintiffs, John J. McLaughlin and Marilyn M. McLaughlin, allege that the defendants, the City of Philadelphia Department of Human Services and its Commissioner, Irene Pernsley, violated their rights under the United States Constitution when the defendants, pursuant to their policy against cross-racial long-term foster care placements and adoptions, removed Raymond Bullard, a black child committed to plaintiffs' foster care, from plaintiffs' home on October 18, 1985.[1]

Raymond Bullard lived with the plaintiffs, a white couple, for a two-year period commencing when the boy was five months old.

---

1. The defendant, Irene Pernsley, is the Commissioner of the City of Philadelphia Department of Human Services. She is sued in her official capacity. Plaintiffs' Complaint, at p. 2, ¶ 4.

The defendant, City of Philadelphia Department of Human Services (hereinafter "DHS or Department") is an agency of the City of Philadelphia. *Id.* at p. 2, ¶ 5.

Plaintiffs allege that the defendants removed Raymond Bullard from their home and then placed him with a black foster family, the Williams family, only because plaintiffs are white and for no other reason. Moreover, plaintiffs allege that Raymond Bullard was removed from their home on this October 1985 date without the notice required by Pennsylvania law. Thus, plaintiffs allege that defendants violated their rights to the equal protection of the laws and to due process of law; rights secured to them by the Fourteenth Amendment to the United States Constitution.[2]

The plaintiffs, in their complaint, seek injunctive relief, compensatory damages, punitive damages, as well as reasonable attorney's fees from defendants to redress these alleged constitutional violations. Additionally, the plaintiffs have filed a motion for a temporary restraining order or in the alternative for a preliminary injunction. In their motion for preliminary relief, the plaintiffs request this Court to issue an order, among other things, directing the Department to return the foster child, Raymond Bullard, to their foster care.

The defendants have filed a motion presently before the Court to dismiss plaintiffs' complaint or in the alternative for judgment on the pleadings. This Court will not entertain the defendants' alternative motion for judgment on the pleadings at this time. *See* Transcript of Oral Argument (hereinafter "Tr. of Oral Arg.") 2; *id.* 4. Since the resolution of the issues raised by defendants' alternative motion for judgment on the pleadings turn largely on fac-

tual considerations, this Court would entertain the defendants' motion only after the plaintiffs have had a reasonable opportunity to obtain discovery from the defendants.[3]

The defendants move to dismiss plaintiffs' complaint on two grounds. As an initial matter, defendants contend that plaintiffs' commenced judicial proceedings in the Court of Common Pleas, Family court division, where plaintiffs had a full and fair opportunity to have their claims adjudicated. Thus, the defendants assert that plaintiffs are barred from raising these claims again in this Court by virtue of the res judicata doctrine.

The defendants then argue that this Court should abstain from exercising jurisdiction over plaintiffs' claims as required by the comity doctrine first enunciated by the Supreme Court in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The defendants contend that the proceedings commenced by plaintiffs in the state court before the Honorable Harvey N. Schmidt are ongoing in the sense that exceptions to the final order that Judge Schmidt entered on that matter remain to be litigated; first, post-trial before Judge Schmidt and then on direct appeal. Defendants argue that plaintiffs would have an adequate opportunity to raise their federal constitutional claims by litigating their exceptions in these ongoing proceedings.

For reasons set forth more fully below, this Court finds that the plaintiffs' federal constitutional claims are not barred by the res judicata doctrine. Moreover, the Court

**2.** Section 1983 of Title 42, United States Code, provides plaintiffs with a remedy for both their equal protection and due process claims. Plaintiffs also claim that defendants conspired for the purpose of depriving plaintiffs of the equal protection of the laws; thus, stating a claim under 42 U.S.C. § 1985(3). Finally, plaintiffs in their complaint allege a pendent state claim against defendants for the intentional infliction of emotional distress. *See* Plaintiffs' Complaint, at p. 7–8, ¶¶ 30–38.

**3.** Thus, the Court will not rule at this time on defendants' claim that they "are entitled to judgment on the pleadings because they violated no constitutional rights of the plaintiffs." Defend-

ants' Motion to Dismiss Complaint or in the alternative for Judgment on the Pleadings, at p. 16; *see id.* at pp. 16–25.

Additionally, the Court will not rule at this time on defendants' contention that plaintiffs' claim under 42 U.S.C. § 1985(3) must be dismissed or that plaintiffs' claim for punitive damages must be dismissed. *See* Defendants' Motion to Dismiss Complaint or in the Alternative for Judgment on the Pleadings, at pp. 15–16. These matters at first glance appear to turn on purely legal considerations. However, the Court will not rule on these matters at this time because the issues presented have been inadequately briefed.

should not abstain from exercising its rightful jurisdiction over these claims. Accordingly, this Court will deny the defendants' motion to dismiss plaintiffs' complaint or in the alternative for judgment on the pleadings.

## I. The Facts

Raymond Christopher Bullard was born on June 25, 1983 in Philadelphia, Pennsylvania to his natural parents believed to be Martina Brown and a Mr. Bullard, whose first name is unknown to the Court.[4] Subsequent to Raymond's birth and for a short time only, Ms. Brown was the sole custodial parent of the child. *See* Defendants' Motion to Dismiss Complaint or in the Alternative for Judgment on the Pleadings, at Exhibit A (hereinafter "Petition for Return of Foster Child"). It is believed by plaintiffs that Mr. Bullard does not want to parent the child. Petition for Return of Foster Child, at p. 2, ¶ 9.[5]

On November 7, 1983, Raymond Bullard was adjudicated dependent and committed to the temporary legal custody of the Department by the Honorable Raymond Lederer, Court of Common Pleas of Philadelphia County, Family court division, retroactive to October 19, 1983, when Raymond was placed into foster care.

Raymond Bullard was placed into emergency foster care by the Catholic Social Services (hereinafter "CSS"), a private, nonprofit foster family care agency under contract with the Department. The Catholic Social Services placed Raymond Bullard, who is black, with the McLaughlins, who are white, on October 19, 1983.[6]

The Catholic Social Services, under the contractual arrangement it has with the DHS, provides for the care, protection, training and education of dependent children assigned to it by the Department. The CSS also, pursuant to its contract with the Department, places dependent children assigned to it, such as Raymond Bullard, into foster homes.

Although the original placement was for emergency foster care, which is normally for a period not in excess of ninety (90) days, the arrangement became, by the Department's actions, one of continuing foster care.[7] The plaintiffs provided foster care to Raymond Bullard for two years.[8]

The McLaughlins allege that they were, are and throughout have been willing to provide a long-term continuing family relationship for Raymond. The plaintiffs also allege that they informed CSS, although at a time not specified in their complaint, of their wish to adopt the child if and when the natural parents' rights were terminated.

In early October, 1985, the Department was advised that the Catholic Social Servic-

---

4. Martina Brown and Mr. Bullard, have never been married.

5. It is also believed by plaintiffs that the Catholic Social Services feel that "the goal of [reunifying Raymond with his natural mother] [is] unrealistic, and ... that the Catholic Social Services agency would be happy to see the goal changed to adoption." Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss or for Judgment on the Pleadings, at Exhibit A.

6. The McLaughlins, who are married, are the natural parents of three children, Marilyn, Kevin and Timmy. The plaintiffs have also been foster parents, duly approved by the DHS to provide foster care to dependent children. They have provided foster care to four children, including Raymond Bullard, over a period of approximately fourteen (14) years and have adopted one of these children. *See* Plaintiffs' Complaint, at p. 3, ¶ 10.

7. The defendants contend that after several months, it became apparent to both CSS and the Department that Raymond Bullard's natural mother was making only intermittent progress toward reunification with her son, and that long-term foster care might be necessary.

8. During the two years that Raymond Bullard lived with the McLaughlins, the McLaughlins allege that they developed a deep love and affection for him. Moreover, the plaintiffs provided a sensitive, caring and secure home for him. During this critical period of his development from five months to two and one-half years old, the plaintiffs further allege that Raymond Bullard formed a strong and affectionate love for the plaintiffs as well. From this relationship, Raymond Bullard, it is alleged, developed outgoing attitudes, behavior and personality. A psychological bonding between Raymond Bullard and the McLaughlins occurred during this period.

es, pursuant to Department policy, intended to remove Raymond Bullard from the McLaughlins and place him with a black family. Specifically, the defendants admit that they "were advised by CSS" on or about October 7, 1985 "that Raymond Bullard would be placed with a black family." Defendants' Answer to Plaintiffs' Complaint, at p. 2, ¶ 14. The McLaughlins also were advised at that time by the CSS that Raymond would be placed with a black family.

On October 10, 1985, despite plaintiffs' objections, Raymond Bullard was taken from their home to stay overnight with a black foster family. The plaintiffs' allege that the CSS, at that time, erroneously represented to them that the Williams family, the black family with whom Raymond was to stay overnight, would adopt the child if and when the natural parents' parental rights were terminated—whereas, in fact, the Williams family have never so intended.

On October 18, 1985, the plaintiffs' allege that the CSS, acting for and on behalf of defendants, removed Raymond Bullard from their foster care. The sole reason for the removal, plaintiffs allege, was that the McLaughlins were white and that Raymond Bullard was black. Moreover, the plaintiffs' allege that the removal was effectuated pursuant to defendants' policy that determines long-term foster placements and adoptions on the basis of race.[9]

The plaintiffs, in their complaint, further allege that neither the Department nor the CSS provided the plaintiffs, as required by Pennsylvania law, with 15 days written notice of the decision to move the child to a new foster home nor of their right to appeal that decision to a state administrative agency, *to wit*, the Commonwealth of Pennsylvania Department of Public Welfare, *see* 55 Pa.Code § 3700.73, within 15 days of receiving such notice. The defendants do not dispute this allegation.

In fact, the defendants admit that the "CSS did not provide the McLaughlins with 15 days' written notice of the decision to move Raymond [Bullard] to a new foster home nor of their right to appeal that decision to a state administrative agency within 15 days of receiving such notice." Defendants' Answer to Plaintiffs' Complaint, at p. 3, ¶ 18. However, the defendants take the position that they "had no legal responsibility to provide notice to the McLaughlins, who were serving as foster parents for CSS." *Id.*

On November 21, 1985, a dispositional review hearing was held before Master Shawn Lacy Jackson, Court of Common Pleas of Philadelphia County, Family court division, in accordance with state law, *see* 42 Pa.C.S. § 6341, to review Raymond's placement with the Williams family. Master Jackson approved the placement.

On February 25, 1986, the plaintiffs commenced an action in the Court of Common Pleas of Philadelphia County, Family court division before the Honorable Harvey N. Schmidt. Plaintiffs commenced this action by filing a Petition for Return of Foster Child (hereinafter "Petition for Return of Foster Child" or "petition") with the Family court division. The plaintiffs' petition was entered on the Family court division's dependency petition docket and was assigned Dependency Petition # 2011-83-10. *See* Defendants' Motion to Dismiss Complaint or in the alternative for Judgment on the Pleadings, at Exhibits A & B.

---

9. The plaintiffs' allege that the defendants' removal of Raymond from their care has permanently disrupted the child's sense of security and has created noticeable anxiety and fright in the boy. Moreover, the removal, it is alleged, has severely traumatized Raymond, delayed his development, and changed his behavioral patterns. Because of the removal, the plaintiffs assert that Raymond has had to attend two-hour therapy sessions at the Child Guidance Clinic twice each week.

The McLaughlins allege that they have been emotionally injured by the brutal removal and loss of a child they have cared for, and by the knowledge of the distress and injury caused to a person they loved. The plaintiffs further allege that the defendants have blocked their efforts to see Raymond Bullard or to preserve any relationship with him.

Judge Schmidt held a total of six hearings on plaintiffs' Petition for Return of Foster Child. These hearings took place on March 19, 1986, April 3, 1986, April 15, 1986, April 29, 1986, May 22, 1986, and July 10, 1986. On July 10, 1986, the Honorable Harvey N. Schmidt denied plaintiffs' Petition for Return of Foster Child.

The plaintiffs filed timely exceptions to Judge Schmidt's Order of July 10, 1986. *See* Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss Complaint or in the Alternative for Judgment on the Pleadings, at Exhibit C (Exceptions of John and Marilyn McLaughlin to the Court's Order of July 10, 1986).[10] By agreement of counsel, the Department was granted an indefinite extension of time to respond to plaintiffs' exceptions, in order that an independent psychiatric evaluation of Raymond Bullard might occur and perhaps obviate the need for any further litigation.

Eileen Bazelon, M.D., a child psychiatrist, was mutually chosen by the parties to conduct a professional evaluation of how Raymond Bullard would be affected psychologically by a return to his original foster parents. Doctor Bazelon, after reviewing reports of earlier evaluations and conducting her own evaluation of Raymond Bullard, in a report dated November 24, 1986 stated that, "Raymond Bullard suffered a clinical depression of childhood

since leaving the McLaughlins", and that "... the childhood depression he is now experiencing ... has significantly interfered with his current functioning and level of achievement ...". Doctor Bazelon further related that it was her professional opinion that, "Raymond Bullard should return to the McLaughlin's home.... If he is not returned ... he will continue to be clinically depressed and speech will continue to be delayed." *See* Plaintiffs' Complaint, at Exhibit A.[11]

After the results of Dr. Bazelon's evaluations were obtained, counsel for the Department notified plaintiffs' counsel that the Department nevertheless believed that Raymond Bullard should remain in his current foster home.[12] Thereafter, the instant action for the alleged deprivation of plaintiffs' civil rights was filed with this Court.

In this Court, the plaintiffs claim, *inter alia,* that Raymond Bullard was removed from their foster care solely on the basis of race. Moreover, plaintiffs claim that this removal was accomplished pursuant to Department policy and with the Department's knowledge and approval.[13]

Accordingly, the plaintiffs claim that the defendants' actions violate their right to the equal protection of the laws under the Fourteenth Amendment to the United States Constitution. Thus, plaintiffs' state a claim cognizable under 42 U.S.C. § 1983.

10. The plaintiffs, in the exceptions they filed to Judge Schmidt's Order of July 10, 1986, raise many issues, including issues of constitutional dimension. This fact alone, however, has no legal consequence. The question that has legal consequence is whether the plaintiffs have standing to raise these claims in the Pennsylvania appellate courts on direct appeal and then specifically in the Family court division of the Court of Common Pleas of Philadelphia County.

11. The plaintiffs, on information and belief, assert that no other psychological examination or evaluation has been made concerning what the emotional impact on the child would be if he is returned to their foster care. *See* Plaintiffs' Motion for Temporary Restraining Order or in the alternative for Preliminary Injunction, p. 2, ¶ 4.

12. The plaintiffs allege that the CSS through their counsel, informed plaintiffs, after receiv-

ing Dr. Bazelon's report that CSS would promptly carry out any direction by the City of Philadelphia Department of Human Services to return Raymond Bullard to his original foster family.

13. In the defendants' Answer to Plaintiffs' Complaint, at p. 4, ¶ 31, they admit "that the removal of Raymond Bullard occurred with the knowledge and approval of the Department."

More significantly, the defendants through counsel also admit in this regard that "[T]he Department [took] exception to the way the removal was done in this case, and that we, [The Department] will be dealing with Catholic Social Services on this issue and *promulgating appropriate guidelines* so that the [sic] type of situation does not happen again." Tr. of State Pro. at 26 (emphasis added).

Moreover, the plaintiffs further claim that the defendants' actions amount to a conspiracy to deny plaintiffs their rights to the equal protection of the laws. Thus, plaintiffs state a claim cognizable under 42 U.S.C. § 1985(3).

The plaintiffs also claim that Pennsylvania law creates a right and interest in foster parents not to have their relationship with a foster child arbitrarily, capriciously and unlawfully disrupted. Plaintiffs claim that the defendants deprived them of this state-created right in violation of their right to due process of law under the Fourteenth Amendment to the United States Constitution.

Finally, the plaintiffs' complaint states a cause of action under Pennsylvania law for the intentional infliction of emotional distress.

The plaintiffs request this Court to:

(1) declare the defendants' policy removing children from foster families solely on the ground of race unconstitutional.

(2) enjoin the continuation of this practice;[14]

(3) order the defendants to take all action necessary to return Raymond Bullard to the foster care of the McLaughlins; *and*

(4) order defendants to pay $500,000 in compensatory damages and $500,000 in punitive damages, as well as reasonable attorney fees.

Presently, the defendants claim in this Court, relying upon both the res judicata and the *Younger* comity doctrines, that the plaintiffs' complaint should be dismissed. The Court will now address the defendants' contentions.

## II. RES JUDICATA

The defendants argue that the July 10, 1986 Order entered by Judge Schmidt in the Family court division, Court of Common Pleas, denying plaintiffs' Petition for Return of Foster Child, precludes plaintiffs' from bringing their action in this Court by virtue of the res judicata doctrine.

The doctrine of res judicata operates to bar decision by a court of a cause of action or claim which another court of valid jurisdiction has already decided. *Husbands v. Commonwealth of Pennsylvania*, 395 F.Supp. 1107, 1130 (E.D.Pa.1975) (Newcomer, J.); *See Mattas v. Supreme Court of Pennsylvania*, 576 F.Supp. 1178, 1184–85 (W.D.Pa.1983); *Duquesne Slag Products Co. v. Lench*, 490 Pa. 102, 105, 415 A.2d 53, 55 (1980).

Under federal law, "[t]he ... judicial proceedings of any court of any ... State shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State...." 28 U.S.C. § 1738. Thus, section 1738 requires federal courts to give res judicata effect to a state judgment to the extent the state would give its own prior judgment such effect. *Davis v. United States Steel Supply*, 688 F.2d 166, 170 (3d Cir.1982), *cert. denied*, 460 U.S. 1014, 103 S.Ct. 1256, 75 L.Ed.2d 484 (1983). Res judicata, however, is an affirmative defense. *See* Fed.R.Civ.P. 8(c), and the party asserting such a bar bears the burden of showing that it applies. *Id.*

Under Pennsylvania law, a final judgment on the merits of a prior case is a necessary prerequisite to the application of the res judicata doctrine. *Nobel v. Morchesky*, 697 F.2d 97 (3rd Cir.1982). Thus, it is fundamental that the doctrine of res judicata may not be relied upon unless the matter in question has been adjudicated, either expressly or by necessary implication. *See Husbands v. Commonwealth of Pennsylvania*, 395 F.Supp. 1107, (E.D.Pa.1975); *Hawkins v. Smith*, 69 Pa. D & C.2d 322, 325 (Ct.Common Pleas 1975).

---

**14.** This Court has serious doubts as to whether plaintiffs have standing to ask this Court to enjoin generally the defendants' continuing practice of removing children from foster families on the basis of race pursuant to defendants' allegedly unconstitutional policy. *See City of*

*Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). However, this Court will postpone dismissal of this aspect of the plaintiffs' claim for relief on standing grounds until the parties have an opportunity to be heard on this issue.

The Court finds that Judge Schmidt did not adjudicate the claims plaintiffs raised in their Petition for Return of Foster Child, either expressly or by necessary implication. Accordingly, defendants cannot rely upon the Order Judge Schmidt entered on July 10, 1986 as a bar to the instant litigation.

The plaintiffs in their Petition for Return of Foster Child alleged that Raymond Bullard was removed from their foster care by the Catholic Social Services. The plaintiffs further alleged in their petition, as before mentioned, that when the child was removed from their home, they did not receive the fifteen (15) days written notice from either the Department or the CSS as required by the Pennsylvania Foster Family Care Agency regulation codified at 55 Pa.Code § 3700.73.[15]

The plaintiffs in their Petition for Return for Foster Child further stated that in accordance with 55 Pa.Code § 3700.73, "the McLaughlins are entitled to the immediate return of RAYMOND to their foster care and custody pending full and fair notice as required by same [55 Pa.Code § 3700.-73(b)] and pending determination of their appeal if DHS and CSS persisted in seeking to move RAYMOND to the WILLIAMSES [sic]." Petition for Return of Foster Child, at p. 5, ¶ 22.

The plaintiffs then argue in this petition that "the best interests of the child RAYMOND, would be served by returning him to the McLAUGHLINS for long-term foster care, for at least the following reasons:

(a) The McLAUGHLINS and RAYMOND have developed a strong parent-child bond, which is most beneficial to RAYMOND'S psychological and physical well-being and growth;

(b) Prolonged interference with this parent-child attachment at this time has and will continue to cause RAYMOND severe emotional and mental distress and may scar him for life;

(c) The McLAUGHLINS, if given the opportunity, would immediately adopt RAYMOND, and thereby provide the most security and sense of security for the child;

(d) As individuals, as husband and wife, and as parents, the McLAUGHLINS are highly respected and regarded by their white and/or black relatives, friends, neighbors, and acquaintances in their community;

(e) Said community has fully and warmly accepted RAYMOND as part of the McLAUGHLINS' [sic] family;

(f) The McLAUGHLINS are persons of high moral character and would pro-

---

15. The foster family care agency regulation codified at 55 Pa.Code § 3700.73 provides as follows:

§ 3700.73. Foster Parent appeal of child relocation.

(a) Foster parents may appeal the relocation of a child from a foster family home except under the following conditions:

(1) the child has been with the foster family less than six months;

(2) the removal is initiated by the court;

(3) the removal is to return the child to his parents;

(4) the removal is to place the child for adoption; or

(5) an investigation of a report of alleged child abuse indicates the need for protective custody removal to protect the child from further serious physical or mental injury, sexual abuse, or serious physical neglect as defined in Chapter 3490 (relating to child protective services—child abuse).

(b) The FFCA shall inform foster parents in writing that they may appeal the relocation of a child in accordance with subsection (a) at least 15 days prior to the relocation of the child.

(c) Foster parents who wish to appeal the relocation of a child must submit to the FFCA a written appeal to be postmarked no later than 15 days after the date of the notice of their right to appeal the child's relocation.

(d) Upon receipt of the foster parent's appeal, the FFCA shall date stamp the appeal and submit it to the Department's Office of Hearing and Appeals, P.O. Box 2675, Harrisburg, Pennsylvania 17120, within three working days.

(e) If a foster parent submits an appeal in accordance with subsection (c) and the foster parent has the right to appeal in accordance with subsection (a), the child must remain in the foster family home pending a decision on the appeal.

(f) All parties to an appeal of a child's relocation may be represented by an attorney or other representative.

vide RAYMOND an excellent moral education and background;

(g) For other reasons which may appear from discovery and/or testimony and/or otherwise in this case.

Petition for Return of Foster Child, at pp. 5–6, ¶ 23.

Thus, plaintiffs' petition states two distinct claims. The first being plaintiffs' claim that their due process rights were violated (the "due process action or claim"). The second being plaintiffs' claim under state law that they are entitled to custody of the foster child (the "custody action or claim").

In their Petition for Return of Foster Child plaintiffs then seek relief from the Family court division by requesting that court to enter an order that the child be returned to plaintiffs' foster care and to decree, *inter alia*, "that [plaintiffs] are and should remain the proper foster parents for the child RAYMOND CHRISTOPHER BULLARD." Petition for Return of Foster Child, at p. 6.

### A.

█ Although the plaintiffs in their petition raised the two claims described above, the Honorable Harvey N. Schmidt, Court of Common Pleas of Philadelphia County, Family court division, did not address these claims in the six hearings that he held on this matter.[16] Judge Schmidt instead treated the plaintiffs' petition as one requesting

his Court to decide the narrow issue of whether the Williams family, as foster parents, could adequately provide for the physical, mental and moral welfare of the foster child, Raymond Bullard. *See* Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss or for Judgment on the Pleadings, at Exhibit A (Transcript of State Proceedings, July 10, 1986, before the Honorable Harvey N. Schmidt) (hereinafter "Transcript of State Proceedings" or "Tr. of State Pro.").[17]

Judge Schmidt did not decide nor did he purport to decide in the proceedings before him the issue of whether Raymond Bullard's interests would be better served by returning the child to the McLaughlin's foster care than by maintaining his current foster placement. Tr. of State Pro. at 12–16. Judge Schmidt also did not address the issue of whether the McLaughlins, as foster parents, could adequately provide for the physical, mental and moral welfare of the foster child. Tr. of State Pro. at 15.

Upon receipt of the plaintiffs' petition, Judge Schmidt exercised the power he possessed under the Juvenile Act, 42 Pa.C.S. §§ 6301–6365, to hold a hearing to receive reports and other evidence bearing on the suitability of Raymond Bullard's most recent disposition—that is, his placement by the Department of Human Services, his temporary legal custodian, with the Williams family. *See* 42 Pa.C.S. § 6341(e); 42 Pa.C.S. § 6351(a)(2)(iii).[18]

---

**16.** This Court also holds that plaintiffs, by pursuing an action for custody in the Family court division, would not be barred from bringing the present action in this Court, even if the State court had adjudicated their claim for custody on the merits. The res judicata doctrine has no application where the cause of action that is the subject matter of the prior proceeding is different from the one presently asserted. *Cf. Davis v. United States Steel Supply,* 688 F.2d 166 (3d Cir.1982), *cert. denied* 460 U.S. 1014, 103 S.Ct. 1256, 75 L.Ed.2d 484 (1983).

Thus, this Court's determination that plaintiffs' state law claim for custody was not adjudicated on the merits is of less moment than this Court's similar finding with respect to the due process claim plaintiffs raised before Judge Schmidt. Had this Court determined that plaintiffs' due process action was adjudicated on the

merits in the state proceedings, that judgment would constitute a bar to the instant litigation.

**17.** On April 15, 1986, Judge Schmidt, granted plaintiffs standing to proceed in his Court on the narrow issue that he perceived to be properly before him.

**18.** On November 7, 1983, the child had been adjudicated dependent under the Juvenile Act. See 42 Pa.C.S. § 6341(c); 42 Pa.C.S. § 6302. Moreover, the Family court division, at that time, had also transferred temporary legal custody of the child to the City of Philadelphia Department of Human Services—"[a] public agency authorized by law to receive and provide care for the child." 42 Pa.C.S. § 6351(a)(2)(iii). Thus, at the time, plaintiffs' filed their Petition for Return of Foster Child, Raymond Bullard remained subject to the Family court division's jurisdiction and supervision.

The remarks made by Judge Schmidt during these hearings are entirely consistent with this view of the state proceedings. Of particular significance to this Court is the following comment made on July 10, 1986, by Judge Schmidt:

> Let's for the sake of just traveling down the road a bit in the future, into the future, say that we have an examination by Dr. Sandler and conclude that the child is not properly placed [with the Williams family]. That does not mean that that child automatically goes back to the McLaughlins. *The child goes back to the Department of Human Services for placement in a suitable place.* I don't want it thought that the alternatives are limited in that manner or to that extent where its either/or, either the present placement or back to the prior placement.

Transcript of State Proceeding at 12–13 (emphasis added).

On July 10, 1986, Judge Schmidt, after finding that the Williams family could adequately provide for the foster child's needs, denied plaintiffs' Petition for Return of Foster Child.

### B.

That Judge Schmidt did not entertain the plaintiffs' action for custody under Pennsylvania law is apparent from both the evidence that is contained in the transcript of the state proceedings and the evidence that is conspicuously absent from this record.

Absent from the record is any evidence that addresses the issue of whether Raymond Bullard's best interests would be better served by returning the foster child to the care of the McLaughlins than by maintaining his recent placement with the Williams family. Moreover, the only competent medical evidence to address this issue was the November 24, 1986 report prepared by Dr. Eileen Bazelon, who advised that psychological harm would accrue to Raymond Bullard if he were not returned to the plaintiffs' care.[19] No court could adjudicate a custody claim without considering evidence of this sort. There is no reason to believe that Judge Schmidt did so in this case.

Moreover, the fitness or ability of the plaintiffs to serve as foster parents was never an issue in the state court. In fact, Judge Schmidt commented:

> I want it known on the record that from all that I know and all that any of us has learned, I'm sure that we agree that the McLaughlins were giving this child the *best care* that you could expect and request.

Transcript of State Proceedings at 15 (emphasis added).

These considerations, in addition to those enumerated above, persuade this Court to conclude that the plaintiffs' custody claim under Pennsylvania law was not adjudicated in the state court, either expressly or by necessary implication.

The same holds true for the plaintiffs' due process action. The plaintiffs' claim that they were deprived of their opportunity to appeal the Department's relocation decision was also not adjudicated nor remedied in the state proceedings. *See* 55 Pa.Code § 3700.73.[20]

---

**19.** Of course, Dr. Bazelon's report was prepared after the state proceedings before Judge Schmidt concluded on July 10, 1986.

**20.** Because this Court finds that the judgment entered by Judge Schmidt on July 10, 1986 on plaintiffs' Petition for Return of Foster Child does not bar the plaintiffs from bringing their due process claim in this Court, it necessarily follows that plaintiffs will be allowed to proceed on all the claims that they have brought in this Court. Where there is no final judgment on the merits of a prior case and the res judicata doctrine has no application, *see Nobel v. Morchesky,*

697 F.2d 97, 102 (3d Cir.1982), it necessarily follows that the corollary claim-splitting doctrine also has no operation.

Moreover, the equities on this point lie with the plaintiffs; especially where the Department throughout the state proceeding maintained that plaintiffs lacked standing to raise any claim before the Family court division, *see* Tr. of State Pro. at 25; Tr. of Oral Arg. 23. Perhaps, this is why the state court, rather than addressing the illegality of the conduct at issue, accepted it as a foregone conclusion. In fact, the state court observed, "It's unfortunate that the child was

Section 3700.73 of Title 55, Pennsylvania Code, grants to "qualified" foster parents, such as plaintiffs, *see* 55 Pa.Code § 3700.-73(a), the right to appeal a foster family care agency's decision to relocate a child from their foster family home. In the first instance, "qualified" foster parents may appeal the decision to relocate the child to the Commonwealth of Pennsylvania Department of Public Welfare's Office of Hearing and Appeals. 55 Pa.Code § 3700.-73(d). Thereafter, judicial review is available in the Pennsylvania Commonwealth Court, *see* 2 Pa.C.S. § 702; 42 Pa.C.S. § 763, and then possibly in the Pennsylvania Supreme Court. *See* 42 Pa.C.S. § 724. *Cf.* 42 Pa.C.S. § 723. Moreover, if "qualified" foster parents, such as the plaintiffs, submit an appeal in accordance with subsection (c) of this regulation, subsection (e) commands that "the child *must* remain in the foster family home pending a decision on the appeal." 55 Pa.Code § 3700.73(e) (emphasis added); *see* Tr. of Oral Arg. 13.

Thus, the Foster Family Care Agency regulation codified at 55 Pa.Code § 3700.-73, not only affords foster parents process by which they can reverse a foster family care agency's decision to relocate a foster child, but the process afforded by the regulation is due them before the deprivation takes place.[21]

Judge Schmidt, however, did not even afford plaintiffs with post-deprivation process in the proceedings before him through which plaintiffs could reverse the Department's decision to relocate Raymond Bullard from their foster family home. As mentioned earlier, Judge Schmidt did not contemplate the return of Raymond Bullard to the McLaughlins as a possible outcome of the proceedings before him. *Cf. Brown v. County of San Joaquin,* 601 F.Supp. 653, 665–666 (E.D.Calif.1985). Rather, Judge Schmidt stated that if he was to conclude that "the child [was] not properly placed. That does not mean that the child automatically goes back to the McLaughlins. The child goes back to the Department of Human Services for placement in a suitable place." Tr. of State Pro. at 13.

Thus, the conclusion that Judge Schmidt did not adjudicate the plaintiffs' due process claim is inescapable.[22]

### III. Abstention

The defendants then argue that this Court should abstain from exercising jurisdiction over the plaintiffs' claims as required by the comity doctrine first enunciated by the Supreme Court in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

Abstention from the exercise of federal jurisdiction is, in all its forms, "the exception, not the rule." *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). It is an extraordinary and narrow exception to a district court's

---

taken away from the McLaughlins, under the circumstances, and I abhor the fact that it happened." Tr. of State Pro. at 15.

**21.** The foster family care agency regulation codified at 55 Pa.Code § 3700.73 contemplates that foster parents who meet the requirements of subsection (a) of the regulation and who file an appeal in accordance with subsection (c) *must* be afforded process before the child is relocated from their foster family home. *See* 55 Pa.Code § 3700.73(e); *Hewitt v. Helms,* 459 U.S. 460, 472, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983) (the repeated use of explicitly mandatory language with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest). *See also* Opinion of the Attorney General of Pennsylvania, Official Op. No. 32, at 118 (1974) ("a due process hearing to foster parents before the re-

moval of a foster child"). The only question remaining concerns what process is due foster parents under this regulation. This process must at least afford foster parents who appeal pursuant to this regulation the opportunity to reverse a foster family care agency's decision to relocate a foster child from their foster family home.

**22.** The Court at this point emphasizes that the defendants have failed to carry their burden of proving that the claims raised by plaintiffs in their Petition for Return of Foster Child were adjudicated in the state court proceedings, either expressly or by necessary implication. The Court also notes that there exists much affirmative evidence in the record presently before it that negates the inference that these claims were adjudicated in the state court.

duty to adjudicate a controversy properly before it, justified only in the exceptional circumstances where resort to state proceedings clearly serves an important countervailing interest. *Id.* With these considerations in mind, this Court will address the question of whether the *Younger* doctrine is applicable to any aspect of the proceedings initiated by the plaintiffs in the Court of Common Pleas.

To do so, this Court looks to the Supreme Court's decision in *Middlesex County Ethics Committee v. Garden State Bar Association,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982), which sets forth the analysis to be applied when a federal court is urged to abstain under *Younger* in deference to a state proceeding. *See Monaghan v. Deakins,* 798 F.2d 632, 642 (3d Cir.1986), *cert. granted,* —— U.S. ——, 107 S.Ct. 946, 93 L.Ed.2d 996 (1987). The Supreme Court in *Middlesex* stated that the appropriate inquiry is three-fold in that a federal district court must answer affirmatively the following three questions before abstaining under the *Younger* doctrine:

"*first,* do [the pending state proceedings] constitute an ongoing state judicial proceeding;

*second,* do the proceedings implicate important state interests; *and*

*third,* is there an adequate opportunity in the state proceedings to raise constitutional challenges." *Middlesex County Ethics Committee,* 457 U.S. at 432, 102 S.Ct. at 2521.

This Court will now apply the three-part test to each of the actions the plaintiffs have raised in the state court in their Petition for Return of Foster Child; first, to the plaintiffs' state law action for custody and then, to the plaintiffs' due process action.

## A.

■ With respect to plaintiffs' state law action for custody, this Court at the outset finds that the proceedings initiated by plaintiffs in this regard in the state court

are ongoing in the sense that exceptions to the order that Judge Schmidt entered on this matter remain to be litigated; first, post-trial and then on direct appeal. Moreover, this Court will assume without deciding that the proceedings on plaintiffs' state law action for custody are proceedings that implicate important state interests as these terms have been defined by *Younger* and its progeny. This Court, however, finds that the third-prong of the *Middlesex* test is not satisfied in this case.

In deciding whether there is "an adequate opportunity in the state proceedings to raise constitutional challenges", *see Middlesex,* 457 U.S. at 432, 102 S.Ct. at 2521, a federal court must determine "whether [a constitutional] challenge can be raised in the pending state proceedings subject to conventional limits on justiciability." *Moore v. Sims,* 442 U.S. 415, 425, 99 S.Ct. 2371, 2378, 60 L.Ed.2d 994. *See id.* at 425 n. 9, 99 S.Ct. at 2378 n. 9. Thus, in deciding whether the *Younger* doctrine applies to the custody proceedings initiated in the Common Pleas Court, this Court must resolve the question of whether the plaintiffs, as former foster parents, have standing under Pennsylvania law to sue for custody of the foster child. Unless the plaintiffs have standing to sue for custody of the foster child, they can not litigate the exceptions they filed to the order entered by Judge Schmidt on July 10, 1986.

This standing issue was addressed by the Pennsylvania Superior Court in *Priester v. Fayette County Children and Youth Services,* 354 Pa.Super. 562, 512 A.2d 683 (1986).

In *Priester,* the Superior Court held, as a matter of Pennsylvania law, that "former foster parents who no longer have possession of the child, lack standing to pursue an action for custody[.]" *Id.*

The *Priester* decision was rendered by the Superior Court on July 7, 1986, three days before Judge Schmidt entered his order on July 10, 1986, denying plaintiffs' Petition for Return of Foster Child.[23]

---

**23.** The evidence in the record suggests that

Judge Schmidt and counsel for both parties did

Nevertheless, the *Priester* decision would operate in the case at bar so as to foreclose the plaintiffs' opportunity to litigate those exceptions to Judge Schmidt's final order that pertain to their action for custody. The plaintiffs now simply lack standing to do so. *See generally Bradley v. School Board of City of Richmond*, 416 U.S. 696, 711–718, 94 S.Ct. 2006, 2016–2019, 40 L.Ed.2d 476 (1974).

Before this Court, counsel for defendants argued that *"Priester* ... makes clear that former foster parents do not possess standing *at any time* to request the return of a former foster child to their custody." Tr. of Oral Arg. 7 (emphasis added).

While focusing more specifically on the case at bar, counsel for defendants added that "[t]he problem is, once the child has been relinquished to the agency and the plaintiffs have waited a substantial period of time before initiating any action, ... *Priester* would have application, and that is the situation that we are currently faced with today." Tr. of Oral Arg. 8.

Because the plaintiffs lack standing to pursue their federal constitutional claims in the proceedings pending in the state court on their custody action, abstention by this Court under the *Younger* doctrine would be inappropriate.

**B.**

The defendants, however, in their supplemental brief filed after oral argument, take the position, in contradiction to the position taken above, that it is unclear under Pennsylvania law whether foster parents, who no longer have possession of the child and who were denied their right to appeal an agency's relocation decision, as in the case at bar, have standing to pursue an action for custody in the Pennsylvania courts.[24] This Court disagrees. The decision by the Superior Court in *Priester* is dispositive on this point of law.

The Superior Court's decision in *Priester* to deny former foster parents standing to pursue an action for custody was based on its examination of the nature of the foster parent/foster child relationship. In reaching its result, the *Priester* court not only determined that foster care is "noninstitutional substitute care" ... "that is for a planned period", but implied that to grant foster parents standing to pursue an action for custody would impair the ability of a foster family care agency "to protect the interests of children such as the one whose custody appellant—[foster parent] seeks." *Priester*, 512 A.2d at 685. Thus, the holding in *Priester* is based on considerations that are independent of and that do not turn on the process rights afforded to foster parents under a state administrative regulation. *See Priester*, 512 A.2d at 685 (Beck, J., concurring) ("consideration of the provisions of Section 3700 does not affect the result reached by the majority").

Foster parents who are denied their regulatory right to appeal a foster family care agency's decision to relocate a foster child from their foster family home, *see* 55 Pa. Code § 3700.73, are entitled only to the process that is due them under the state administrative regulation.

**C.**

Before this Court can decide whether the *Younger* doctrine applies to the plaintiffs' due process action that is pending in the state court, this Court must address plaintiffs' assertion that the Family court division is not competent to adjudicate their

---

not consider the *Priester* decision in the state proceedings on July 10, 1986. *See* Tr. of State Pro. at 1–27.

**24.** Defendants ask this Court to abstain from deciding this question under the *Pullman* doctrine where the resolution of this question is necessary for this Court to decide whether abstention under the *Younger* doctrine is appropriate. *See Railroad Commission of Texas v. Pull-*

*man*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

As this Court points out in the text, Pennsylvania law on the point defendants raise is not uncertain. Moreover, a decision on the merits of plaintiffs' federal constitutional claims would not be obviated if this Court abstained under *Pullman*. A decision on the merits of plaintiffs' federal claims will almost certainly occur in either the state court or in this Court.

civil rights claim. Plaintiffs argue that jurisdiction to decide their due process action is vested only in the Civil Division of the Court of Common Pleas. This Court, however, disagrees.

The Family court division of the Court of Common Pleas is an administrative branch of the state trial court. *See* 42 Pa.C.S. §§ 951, 952. The Family court division, contrary to plaintiffs' suggestion, "is vested with the full jurisdiction of the whole court [Court of Common Pleas]...." 42 Pa.C.S. § 952. While the plaintiffs' due process action might have been more appropriately brought in the Civil Division, the Family court division can adjudicate the merits of plaintiffs' due process claim. *See Hollman v. Hollman,* 347 Pa.Super. 289, 500 A.2d 837 (1985).

Pennsylvania courts have rejected "the notion that a jurisdictional issue is raised merely by consideration of the division within a common pleas court in which an action is commenced...." *Hollman v. Hollman,* 347 Pa.Super. 289, 500 A.2d 837, 852 (1985) (Johnson, J., concurring and dissenting opinion in which Rowley, J., joined and in which Spaeth, President Judge, Cavanaugh and McEwen, JJ., joined as to subject-matter jurisdiction only).

"The question as to which division of a court of common pleas is the proper forum for commencing an action ... is not one of jurisdiction, but of internal common pleas court administration." *Id.,* 500 A.2d at 853 (citations omitted).

Now this Court turns to determine the applicability of the *Younger* doctrine to the plaintiffs' due process action. Where the pending state proceeding is a privately initiated one, as is the case with the plaintiffs' due process action, the state's interest in the proceeding is not strong enough to merit *Younger* abstention, for it is no greater than its interest in any other litigation that takes place in its courts. *See Harris v. Pernsley,* 755 F.2d 338, 344 (3d Cir.1985), *reh'g denied* 758 F.2d 83 (1985), *cert. denied,* — U.S. —, 106 S.Ct. 331, 88 L.Ed.2d 314 (1985); *Williams v. Red Bank Board of Education,* 662 F.2d 1008,

1019 (3d Cir.1981); *Johnson v. Kelly,* 583 F.2d 1242, 1249 (3d Cir.1978). *See also New Jersey Education Association v. Burke,* 579 F.2d 764, 767 (3d Cir.1978).

The plaintiffs' due process action, being one that could have been brought, in the first instance, in either a state or a federal forum, is more properly viewed as a state law action that is concurrent to the action presently brought by plaintiffs in this Court. Accordingly, this Court concludes that as to the plaintiffs' due process action the *Younger* doctrine has no application.

## IV. Colorado River Water Conservation District Abstention

■ Where the plaintiffs lack standing to pursue their action for custody and only their due process action remains pending in the state court, this Court must decide whether it should abstain from exercising jurisdiction over plaintiffs' claims once again; this time, however, under the principles set forth by the Supreme Court in *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). *See Moses H. Cone Memorial Hospital v. Mercury Construction Corporation,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *McClellan v. Carland,* 217 U.S. 268, 30 S.Ct. 501, 54 L.Ed. 762 (1910).

Generally, as between state and federal courts, the rule is that "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction...." *McClellan,* 217 U.S. at 282, 30 S.Ct. at 505. This rule pertains because "federal courts have a 'virtually unflagging obligation ... to exercise the jurisdiction given them.'" *Moses H. Cone Memorial Hospital v. Mercury Construction Corporation,* 460 U.S. 1, 15, 103 S.Ct. 927, 936, 74 L.Ed.2d 765 (1983).

A federal district court's task "in cases such as this is not to find some substantial reason for the *exercise* of federal jurisdiction ...; rather, the task is to ascertain whether there exist 'exceptional circumstances,' ... that can suffice to justify the

*surrender* of that jurisdiction." *Moses H. Cone Memorial Hospital,* 460 U.S. at 25–26, 103 S.Ct. at 942 (emphasis in original).

The Supreme Court has not provided federal district courts with a hard-and-fast rule by which they can determine whether dismissal of a case under *Colorado River* is warranted; rather, the Supreme Court has described some of the factors relevant to making a decision of this type. *See id.* at 15, 103 S.Ct. 936. The factors include:

1. the inconvenience of the federal forum;

2. the desirability of avoiding piecemeal litigation;

3. the order in which jurisdiction was obtained by the concurrent forums; *and*

4. whether federal law provides the rule of decision on the merits.

*See Moses H. Cone Memorial Hospital,* 460 U.S. at 15, 103 S.Ct. at 936.[25]

"No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise is required. Only the clearest of justifications will warrant dismissal." *Moses H. Cone Memorial Hospital v. Mercury Construction Corporation,* 460 U.S. 1, 15–16, 103 S.Ct. 927, 936–937, 74 L.Ed.2d 765 (1983) (quoting *Colorado River Water Conservation District,* 424 U.S. at 818–819, 96 S.Ct. at 1246–1247 (emphasis original; citations omitted)).

Turning to the instant case, the federal forum is not an inconvenient one for the litigants. Moreover, the plaintiffs have raised in this Court all their claims under both federal and state law that pertain to the underlying transaction that forms the subject matter of the litigation. Thus, this Court is in a position to adjudicate the entire controversy in one legal proceeding.

Although suit was commenced first in the state court, little progress has been made in the Court of Common Pleas toward adjudicating the merits of the plaintiffs' due process action. This Court, however, stands ready to address the merits of plaintiffs' request for preliminary relief. Additionally, this Court will proceed forthwith to address any remaining issues at a trial on the merits. *See* Fed.R.Civ.P. 65(a)(2).[26]

Finally, the plaintiffs seek relief in this Court in large part under 42 U.S.C. § 1983. Federal law also will provide the rule of decision for three of the four claims brought by plaintiff in this Court. *See Moses H. Cone Memorial Hospital v. Mercury Construction Corporation,* 460 U.S. 1, 23, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983); *Signad, Inc. v. City of Sugar Land,* 753 F.2d 1338, 1340 (5th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985); *Tovar v. BillMeyer,* 609 F.2d 1291, 1293 (9th Cir.1980).[27]

Thus, this Court, after considering the factors that comprise the *Colorado River* analysis, finds that exceptional circumstances do not exist to justify the surren-

---

**25.** "It has been held ... that the court first assuming jurisdiction over property may exercise that jurisdiction to the exclusion of other courts." *Colorado River Water Conservation District,* 424 U.S. at 818, 96 S.Ct. at 1246. In the case at bar, there has been no assumption by either court of jurisdiction over any res or property. *See Moses H. Cone Memorial Hospital,* 460 U.S. at 19, 103 S.Ct. at 938.

**26.** In *Moses H. Cone Memorial Hospital v. Mercury Construction Corporation,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), the Supreme Court explained that federal courts should refrain from giving "too mechanical a reading to the 'priority' element of the *Colorado* balance." *Id.* at 21, 103 S.Ct. at 939.

"This factor, as with the other *Colorado River* factors, is to be applied in a pragmatic, flexible manner with a view to the realities of the case at hand." *Id.*

**27.** "We must agree with the Ninth Circuit's statement that the 'unflagging obligation' of the federal courts to exercise the jurisdiction given them is particularly weighty when those seeking a hearing in federal court are asserting ... their right to relief under 42 U.S.C. § 1983." *Signad, Inc. v. City of Sugar Land,* 753 F.2d 1338, 1340 (5th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985) (quoting *Tovar v. BillMeyer,* 609 F.2d 1291, 1293 (9th Cir.1980).

der by this Court of its jurisdictional obligation. Accordingly, abstention under *Colorado River* would be inappropriate.

## V. Relief

Defendants contend that plaintiffs lack standing in this Court to request that the child be returned to their custody and care, as a remedy to the alleged violation of their constitutional rights. The defendants specifically argue that because plaintiffs lack standing in the Pennsylvania courts to sue for custody of the child, *see Priester v. Fayette County Children and Youth Services*, 354 Pa.Super. 562, 512 A.2d 683 (1986), that plaintiffs should equally be unable to do so in this Court. *See* Tr. of Oral Arg. 15. This Court, however, disagrees.

Whether the plaintiffs have standing to pursue an action for custody in the Pennsylvania Courts is entirely a matter of Pennsylvania law. Equally, whether plaintiffs have standing to ask this Court for a particular remedy for the alleged violation of their federal constitutional rights is entirely a matter of federal law. Thus, the Pennsylvania Superior Court's decision in *Priester v. Fayette County Children and Youth Services*, 354 Pa.Super. 562, 512 A.2d 683 (1986), holding that former foster parents, who no longer have possession of the child, lack standing to pursue an action for custody in the Pennsylvania Courts, has no bearing on the federal question that is before this Court.[28]

This Court, as a remedy to an established due process violation, could grant the equitable relief sought by plaintiffs. Specifically, if this Court were to find that foster parents, such as the plaintiffs, were entitled under Pennsylvania law to process by which they could challenge and reverse a foster family care agency's decision to relocate a child from their foster family home and that this process was due them before the contemplated deprivation took place, then an appropriate judicial remedy would be to restore the child to the plaintiffs' foster care if granting this remedy would not harm the child. *See e.g., Brown v. County of San Joaquin*, 601 F.Supp. 653 (E.D.Calif.1985).[29]

■ Whether this Court could grant the relief that plaintiffs seek, as a remedy to an established equal protection violation, is a different matter entirely. This Court recognizes that granting plaintiffs in this situation the equitable remedy they seek—that is, returning Raymond Bullard to their care and custody—would necessarily affect the rights of the foster child. Thus, in deciding whether plaintiffs are entitled to request this relief, this Court must determine whether the plaintiffs, as foster parents, have standing, as a matter of federal law, to raise the foster child's rights in a federal court.

The United States Supreme Court in *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 841 n. 44, 97 S.Ct. 2094, 2108 n. 44, 53 L.Ed.2d 14 (1977), addressed this precise

---

**28.** Perhaps the defendants are attempting to make the argument that if the plaintiffs brought their civil rights action in the Court of Common Pleas, they would not, under Pennsylvania law, have standing to request the equitable remedy they seek.

Whether a Pennsylvania court when entertaining federal constitutional claims brought by a litigant should follow federal justiciability norms in determining whether a litigant has standing is an entirely different, yet interesting matter, and one that this Court does not have to decide. By virtue of the fact that state courts are not Article III tribunals, and thus not bound by its strictures, suggests that state courts could apply and follow State justiciability norms in determining whether a litigant has standing to bring a federal constitutional claim in the state forum. However, this Court, can well imagine

circumstances when this reasoning would be unsound. This would be especially true in a situation where the application of state justiciability norms would deprive a plaintiff of an opportunity to have his federal constitutional claims heard in a federal forum, either as an original matter or on review. *See* Sager, Foreword: Constitutional Limitations on Congress' Authority to Regulate the Jurisdiction of the Federal Courts, 95 Harvard L. Rev. 17, 61–68 (1981).

**29.** Here, the process due foster parents is designed to affect the foster child's rights. It is only through fair procedures that accurate decisions contemplated to affect both the rights of the foster parents and the foster child can be made.

question holding that foster parents do have standing to raise the rights of foster children in a federal forum.[30]

In *Smith,* individual foster parents and an organization of foster parents, brought a civil rights class action pursuant to 42 U.S.C. § 1983 in the United States District Court for the Southern District of New York, on their own behalf and on behalf of children for whom they had provided homes for a year or more.[31] Plaintiffs sought both declaratory and injunctive relief against New York State and New York City officials, alleging that the procedures governing the removal of foster children from foster homes provided under New York law violated the Due Process and Equal Protection clauses of the Fourteenth Amendment. *See Smith,* 431 U.S. at 818–820, 97 S.Ct. at 2096–2097.

The District Court in *Smith* appointed independent counsel for the foster children to forestall any possibility of conflict between their interests and the interests asserted by the foster parents. A group of natural mothers of children in foster care were granted leave to intervene on behalf of themselves and others similarly situated. *See Smith,* 431 U.S. at 820–822, 97 S.Ct. at 2097–2098.

A divided three-judge District Court held that "the pre-removal procedures presently employed by [New York State] are constitutionally defective," *Organization of Foster Families v. Dumpson,* 418 F.Supp. 277, 282 (S.D.N.Y.1976), and based its holding on an independent right of the foster child "to be heard before being 'condemned to suffer grievous loss,' *Joint Anti-Fascist Committee v. McGrath,* 341 U.S. 123, 168, 71 S.Ct. 624 [, 646], 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)." *Id.*

On appeal before the Supreme Court, New York State and City officials argued that appellee foster parents had no standing to rely upon a supposed right of the foster children to avoid "grievous loss," because the foster children were independently represented by court-appointed counsel who had consistently opposed the relief requested by appellees, and denied that the children had any such right. *See Smith,* 431 U.S. at 841 n. 44, 97 S.Ct. at 2108 n. 44.

The Supreme Court in *Smith* rejected this argument as "[misunderstanding] the peculiar circumstances of this lawsuit," and then explained:

> Ordinarily, ... a party would not have standing to assert the rights of another, himself a party in the litigation; the third party himself can decide how best to protect his interests. But children usually lack the capacity to make that sort of decision, and thus their interest is ordinarily represented in litigation by parents or guardians. In this case, however, the State, the natural parents, and the foster parents, all of whom share some portion of the responsibility for guardianship of the child, ... are parties, and all contend that the position they advocate is *most in accord* with the rights and interests of the children. In this situation, the District Court properly appointed independent counsel to represent the children, so that the court could have the benefit of an independent advocate for the welfare of the children, unprejudiced by the possibly conflicting interests and desires of the other parties. It does not follow, however, that that independent counsel, who is not a guardian *ad litem* of the children, is solely authorized to determine the children's best interest.

> No party denies, or could deny, that there is an Art. III "case or controversy" between the foster parents and the defendant state officials concerning the validity of the removal procedures. Accordingly, their standing to raise the rights of the children in their attack on those procedures is a prudential ques-

---

30. Consequently, the plaintiffs can argue, *inter alia,* that Raymond Bullard has a right not to be removed from a foster family home solely on the basis of race.

31. Plaintiffs, in the case before the Court, bring suit on their own behalf, only.

tion. *Craig v. Boren,* 429 U.S. 190, 193, 97 S.Ct. 451, 455, 50 L.Ed.2d 397 (1976). We believe it would be most imprudent to leave entirely to court-appointed counsel the choices that neither the named foster children nor the class they represent are capable of making for themselves, especially in litigation in which all parties have sufficient attributes of guardianship that their views on the rights of the children should *at least* be heard.

*Smith v. Organization of Foster Families for Equality and Reform,* 431 U.S. 816, 841 n. 44, 97 S.Ct. 2094, 2108 n. 44 (1977). (emphasis added).

This Court perceives no reason why the rule in *Smith* should not apply to the case at bar. In fact, the case for allowing foster parents to raise the federal rights of the child is more compelling in the case before the Court than it was in *Smith.* Here, the natural parents of Raymond Bullard are not parties to the litigation and from all reports they have little or no interest in its outcome. To allow the federal rights of the child, in this case, to rest solely on the shoulders of the defendants would surely be anomalous.

With these considerations in mind, and the additional consideration that federal courts have broad powers to remedy federal constitutional violations, this Court finds that the plaintiffs have standing in this Court to request as a remedy to the alleged violation by defendants of their equal protection rights that the child be returned to their custody and care.

An appropriate Order follows.