John J. McLAUGHLIN and Marilyn M. McLaughlin

v.

Irene F. PERNSLEY, Commissioner and City of Philadelphia, Department of Human Services.

The Reverend Willie WILLIAMS and Elaine Williams

v.

CATHOLIC SOCIAL SERVICES, Sister Marion Dillon, Jack Smith, Robert Letulle and Christine Beahan.

Civ. A. No. 86–7143.

United States District Court, E.D. Pennsylvania.

Aug. 23, 1988.

Michael Churchill, Judith Gran, Philadelphia, Pa., for plaintiffs.

Guy Villim, Chief Asst. City Sol., Philadelphia, Pa., for Irene Pernsley, Com'r and City of Philadelphia, Dept. of Human Services.

Robert T. Vance, Jr., Philadelphia, Pa., for Reverend Willie Williams and Elaine Williams.

John P. O'Dea, Philadelphia, Pa., for Catholic Social Services, Sister Marion Dillon, Jack Smith, Robert Letulle and Christine Beahan.

## MEMORANDUM AND ORDER

HANNUM, Senior District Judge.

In the present action, the plaintiffs, John J. McLaughlin and Marilyn M. McLaughlin, allege that the defendants, the City of Philadelphia Department of Human Services and its Commissioner, Irene Pernsley, violated their rights under the United States Constitution when the defendants, pursuant to their policy against cross-racial long-term foster care placements and adoptions, removed Raymond Bullard, a black child committed to plaintiffs' foster care, from plaintiffs' home on October 18, 1985.[1]

Raymond Bullard lived with the plaintiffs, a white couple, for a two-year period commencing when the boy was five months old.

Plaintiffs allege that the defendants removed Raymond Bullard from their home and then placed him with a black foster family, the Williams family, only because plaintiffs are white and for no other reason. Moreover, plaintiffs allege that Raymond Bullard was removed from their home on this October 1985 date without the notice required by Pennsylvania law. Thus, plaintiffs allege that defendants violated their rights to the equal protection of

---

1. The defendant, Irene Pernsley, is the Commissioner of the City of Philadelphia Department of Human Services. She is sued in her official capacity.

The defendant, City of Philadelphia Department of Human Services (hereinafter "DHS" or "Department") is an agency of the City of Philadelphia.

the laws and to due process of law; rights secured to them by the Fourteenth Amendment to the United States Constitution.[2]

After a hearing and full briefing by the parties, this Court will now rule on the plaintiffs' motion for preliminary injunction.[3]

In order to prevail on their motion for a preliminary injunction, the plaintiffs must demonstrate:

(1) a reasonable probability of eventual success on the merits, *and*

(2) that their interests will be irreparably injured if relief is not granted.

Moreover, the Court should and will take into account when relevant:

(3) the possibility of harm to other interested persons from the grant or denial of the injunction, *and*

(4) the public interest. *See In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1143 (3d Cir.1982).

In addition, the Court notes that mandatory preliminary injunctions, such as the one sought in the case at bar, which seek to alter the status quo are granted only when the facts and the law are clearly in favor of the moving party. *See, e.g., Sovereign Order of Saint John of Jerusalem–Knights of Malta by Coleman v. Messineo*, 572 F.Supp. 983 (E.D.Pa.1983).

Because this Court finds that the plaintiffs have established successfully these criteria and because the law and the facts are clearly in their favor, this Court will grant the plaintiffs' motion for preliminary injunction and will grant the relief the plaintiffs seek; that is, the Court will order the DHS to return Raymond Bullard to the foster care of John and Marilyn McLaughlin. The Court will now examine each of these criteria.

## I. *Likelihood of Success on the Merits*

As described above, the plaintiffs pursue two claims, one based upon the Equal Protection Clause of the Fourteenth Amendment and one based upon the Fourteenth Amendment's Due Process Clause. As to each claim, the Court makes findings of fact and conclusions of law.

### A. EQUAL PROTECTION CLAIM

#### (1) *Findings of Fact*

With respect to plaintiffs' equal protection claim, the Court finds as follows:

Raymond Christopher Bullard was born on June 25, 1983 in Philadelphia, Pennsylvania. Subsequent to Raymond's birth and for a short time only, Martina Brown, Raymond's natural mother, was the sole custodial parent of the child. On November 7, 1983, Raymond Bullard was adjudicated dependent and committed to the temporary legal custody of the Department by the Honorable Raymond Lederer, Court of Common Pleas of Philadelphia County, Family court division, retroactive to October 19, 1983, when Raymond was placed voluntarily by his natural mother into foster care.

Raymond Bullard was placed into emergency foster care by the Catholic Social Services (hereinafter "CSS"), a private, non-profit foster family care agency under contract with the Department. The Catholic Social Services placed Raymond Bullard, who is black, with the McLaughlins, who are white, on October 19, 1983.

The Catholic Social Services, under the contractual arrangement it has with DHS, provides for the care, training and education of dependent children assigned to it by the Department. CSS also, pursuant to its contract with the Department, places dependent children assigned to it, such as

---

**2.** Section 1983 of Title 42, United States Code, provides plaintiffs with a remedy for both their equal protection and due process claims. Plaintiffs also claim that defendants conspired for the purpose of depriving plaintiffs of the equal protection of the laws; thus, stating a claim under 42 U.S.C. § 1985(3). Finally, plaintiffs in their complaint allege a pendent state claim

against defendants for the intentional infliction of emotional distress. *See* Plaintiff's Complaint, at p. 7–8, §§ 30–38.

**3.** The Reverend Willie Williams and Elaine Williams, Raymond Bullard's present foster parents, have been allowed to intervene as defendants.

Raymond Bullard, into foster homes.[4]

Although the original placement was for emergency foster care, which is normally for a period not in excess of ninety (90) days, the arrangement became, by the Department's actions, one of continuing foster care. The plaintiffs provided foster care for Raymond Bullard for two years.

During the two years that Raymond Bullard lived with the McLaughlins, the McLaughlins developed a deep love and affection for him. During this critical period of his development from five months to two and one-half years old, the plaintiffs provided a sensitive, caring and secure home for Raymond. Raymond Bullard during this time developed a strong and affectionate love for the plaintiffs as well. From this relationship, Raymond Bullard developed outgoing attitudes, behavior and personality. A psychological bonding between Raymond Bullard and the McLaughlins occurred during this period.

In early October, 1985, the Department was advised that the Catholic Social Services, pursuant to Department policy, intended to remove Raymond Bullard from the McLaughlins and place him with a black family. Specifically, the defendants admit that they "were advised by CSS" on or about October 7, 1985 "that Raymond Bullard would be placed with a black family." *See* Defendant's Answer to Plaintiffs' Complaint, at p. 2. The McLaughlins also were advised at that time by the CSS that Raymond would be placed with a black family.

On October 10, 1985, despite plaintiffs' objections, Raymond Bullard was taken from their home to stay overnight with a black foster family; that is, with Reverend Willie Williams and Elaine Williams, Raymond's current foster parents. On October 18, 1985, the CSS, acting for and on behalf of the DHS, removed Raymond Bullard from their foster care. The sole reason for the removal was that the McLaughlins were white and that Raymond Bullard was black.

At the hearing on plaintiffs' motion, the intervening and third-party defendants were unable to show that the Department's decision to remove Raymond Bullard from the McLaughlins was based upon any reason other than that of race. The removal, the evidence reveals, was effected pursuant to a DHS' policy decision that was made at least before October 23, 1984. *See* Plaintiffs' Exhibit No. 6, page 9.

This Court is not persuaded that the minor criticisms made about John and Marilyn McLaughlin by CSS' social workers at the hearing entered at all into the DHS' decision to remove Raymond Bullard from the McLaughlins' foster care. These criticisms were not documented nor reduced to writing. These criticisms are part of an attempt to explain prior culpable conduct.[5]

---

**4.** The Court at this time will not rule on the liability of CSS. However, the Court will address the positions taken by the CSS, when relevant, in deciding plaintiffs' motion for preliminary relief.

**5.** In January, 1988, the Acting Director of the Pennsylvania Department of Public Welfare's Office of Hearings and Appeals in another setting made similar observations concerning the events at issue in this case. Mr. Lloyd P. Nyce noted that:

"We are faced with the sad situation of a young, black boy who was neglected by his natural mother and was placed in a white foster home at approximately three months of age and where he remained for two years. During those two years, he evidently was loved and was provided with excellent nurturing and care by the McLaughlin family. For reasons that had nothing to do with the quality of the care being provided by the McLaughlin family, [Raymond Bullard] was suddenly removed from the home and placed with the Williams family, who happen to be a black family. From listening to the testimony during the many hours of this hearing as well as reading the materials submitted, the undersigned has reached the inevitable conclusion that the only reason that Raymond Bullard was removed from the McLaughlin home was the racial factor. The social workers from CSS have testified that they had reservations regarding the suitability of the McLaughlin family, particularly with regard to the dust in their house or the animals in the house as well as a feeling that Mrs. McLaughlin did not cooperate with regard to medical care for R.B. However, all of the reports completed by CSS indicate the exact opposite. All of the reports about the McLaughlins are glowing with regard to the excellent care and cooperation received from the McLaughlins. It was only after the removal of Raymond Bullard that these alleged questions came to light.... It would be an understatement to say that the

**(2)** *Plaintiffs' Exhibits Nos. 1–6*

This Court's factual findings are not only supported by the testimony received at the hearing but are also directly supported by plaintiffs' Exhibits Nos. 1–6 which were received into evidence at the hearing. The Court will now examine these documents in more detail:

**1. Plaintiffs' Exhibit No. 2**

Plaintiffs' Exhibit No. 2 is a letter dated June 21, 1984 from Robert Letulle, Supervisor, Child Care Department, Catholic Social Services, to Joseph McNally, Social Worker, Philadelphia, Department of Human Services, regarding Raymond Bullard. This letter recites in relevant part, that:

"One of the issues that needs to be reviewed is that we still do not have another suitable foster home to which Raymond can be transferred. We still maintain that this is a safe foster home [the McLaughlin's home] for Raymond. However, he is a Black child [sic] and the foster home is White [sic] and we can understand your other concern that Raymond shouldn't remain in this home on a long term basis."

**2. Plaintiffs' Exhibit No. 3**

Plaintiffs' Exhibit No. 3 consists of three documents which are lists. These lists recite in relevant part as follows:

a. Document Dated March 29, 1985
CSS Foster Hom & Inst. Relocations Pending

| Name | DOB | | Race | Rel. | Present Location | Plan | Worker |
|------|-----|---|------|------|------------------|------|--------|
| … | … | | … | … | … | … | … |
| Raymond Bullard | 6/25/83 | 2 | B | P | McLaughlin FH | Needs B FH | Beahan |
| … | … | | … | … | … | … | … |

b. Document Dated April 19, 1985
CSS Foster Home & Inst. Relocations Pending

| Name | DOB | Race | Age | Relig. | Present Location | Plan | Worker |
|------|-----|------|-----|--------|------------------|------|--------|
| … | … | … | … | … | … | … | … |
| Raymond Bullard | 6/25/83 | B | 2 | P | McLaughlin FH | Needs BL FH | Beahan |
| … | … | … | … | … | … | … | … |

c. Document Dated June 17, 1985
CSS Children needing Relocation

| Name | DOB | Age | Race | Relig. | Present Location | Plan | Worker |
|------|-----|-----|------|--------|------------------|------|--------|
| … | … | … | … | … | … | … | … |
| Raymond Bullard | 6/25/83 | 2 | B | P | McLaughlin FH | Needs BL FH | Beahan |
| … | … | … | … | … | … | … | … |

The testimony at the hearing revealed that "Needs B FH" and "Needs BL FH" are shorthand for *needs black foster home.*

**3. Plaintiffs' Exhibit No. 1**

Plaintiffs' Exhibit No. 1 is a document entitled "ADDENDUM TO INDIVIDUAL PROGRAM DESCRIPTION." This document regarding Raymond Bullard was prepared by Ms. Christine M. Beahan in May, 1985. Ms. Christine Beahan was the CSS social worker assigned to the McLaughlin foster home. This document recites in relevant part as follows:

"A. *Child*

.        .        .        .        .

2. *Assessment of Child*

.        .        .        .        .

b. MENTAL EMOTIONAL: Raymond is a very happy child (when he is

testimony provided by the CSS representatives was less than credible."

*See* Plaintiffs' Motion for Preliminary Injunction, at Exhibit one, pages 7–8.

not feeling ill). He is receiving much stimulation from his foster family (the McLaughlin family) and his [sic] psychologically bonded to this family.

### 3. *Areas for Improvement*

There is no need for improvement at this time. Ray is black and in a white home. Raymond has been on a replacement list to be placed in a black home. However, at this point it could be very damaging to remove this child from his present foster home. His [sic] is very attached to the McLaughlin's.

.    .    .    .    .

### C. *Plans and Goals*

Raymond has made a beautiful adjustment in his foster home. Both foster parents [John and Marilyn McLaughlin] have provided Raymond with appropriate stimulation and a genuine security.

.    .    .    .    .

Christine M. Beahan    Caseworker"

### 4. Plaintiffs' Exhibit No. 4

Plaintiffs' Exhibit No. 4 is a document entitled *"Referral for Psychological Testing"* and is dated October 3, 1985. This document recites in relevant part as follows:

"On 9/13/83, Raymond was placed in an Emergency Foster Home under CSS. Although Raymond is Black, a White home [sic] had to be used because it was the only available Infant Home. Since Raymond's [natural] mother agreed to accept referral to a partial hospitalization program, it was believed that the placement would be short term. Raymond has remained in this initial Foster Home until the present time because his [natural] mother has been unable to improve her situation."

"In the Foster Home, Raymond is the youngest child [sic]. Foster Parents are age 46 and 42 and have four young adult children [sic] living at home. Raymond receives a great deal of attention and stimulation. About six months ago, CSS began plans to move Raymond to a Black home where it was felt that his needs for long term care should be better met...."

.    .    .    .    .

"The plan at present is for Raymond to move to a long term Foster Home [sic] of his own race...."

Plaintiffs' Exhibit No. 4 is a Social Summary and was prepared by Sister Eileen Gallagher of the CSS.

### 5. Plaintiffs' Exhibit No. 5

Plaintiffs' Exhibit No. 5 is a page taken from the transcript of legal proceedings that occurred on April 3, 1986 before the Honorable Harvey N. Schmidt, Court of Common Pleas of Philadelphia County.

Before Judge Schmidt, Stacey Meadows, Esq. then Assistant City Solicitor, told Judge Schmidt at page 40 (representing DHS) that:

"The agency [DHS] moved the child [Raymond Bullard] because it felt that racially and culturally his needs would be better served in a black foster home."

### 6. Plaintiffs' Exhibit No. 6

Plaintiffs' Exhibit No. 6 is the Department of Human Services' "CASE RECORD" of Raymond Bullard. This document contains entries that corroborate the Court's findings in all respects. In particular, this exhibit shows that the DHS intended to remove Raymond from the McLaughlin foster home and to place Raymond in a black foster home at least before October 23, 1984. *See* Plaintiffs Exhibit No. 6, page 9.

### (3) *Conclusions of Law*

■ Thus, this Court has determined that Raymond Bullard was removed from the McLaughlins' foster care solely on the basis of race. This Court can only believe that the Department made this purely race conscious decision in an effort to provide Raymond Bullard with adequate long-term foster care; foster care that includes providing for the foster child's racial and cultural needs. However, when a governmental entity such as the Department determines foster care placements on the basis of race, any such decision made by racial

classification is inherently suspect and must be subjected to the most exacting judicial scrutiny. Making decisions about persons according to their race is more likely to reflect racial prejudice than legitimate public concerns. *See Palmore v. Sidoti,* 466 U.S. 429, 432, 104 S.Ct. 1879, 1881, 80 L.Ed.2d 421 (1984).

To pass constitutional muster, a racial classification, such as the racial classification in this case, must be justified by a compelling governmental interest and said classification must be "necessary ... to the accomplishment" of that legitimate purpose, *McLaughlin v. Florida,* 379 U.S. 184, 196, 85 S.Ct. 283, 290, 13 L.Ed.2d 222 (1964). *See Loving v. Virginia,* 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967).

The City's Department of Human Services has a duty of the highest order to protect the interest of minor children, particularly those of tender years such as Raymond. In common with most states, Pennsylvania law mandates that custody determinations be made in the best interest of the children involved. Accordingly, the goal of making an adequate long-term foster care placement that provides for a foster child's racial and cultural needs and that is consistent with the best interests of the child, is indisputably a compelling governmental interest for the purposes of the Equal Protection Clause.

Because a compelling governmental interest is present, this Court must now determine whether the use of race alone by the Department is necessary to accomplish the above-stated compelling governmental interest. The evidence at the hearing revealed that *some* black couples, that is husband and wife, cannot provide to black foster children adequate long-term foster care. The evidence at the hearing also revealed that *some* white couples can provide to black foster children adequate long-term foster care. It is evident from these plain observations that use of race as the *sole criterion* in making proper long-term foster care placements of black foster children is inadequate. Factors such as the ability of foster parents, black or white, to care for the child, to provide a safe, secure and stable home to the child, etc., must be examined in making determinations of this kind. The use of race alone in making long-term foster care placements is not necessary *nor appropriate* to accomplish those salutary governmental objectives stated above.

Thus, this Court is compelled to find that the City's decision to place Raymond into long-term foster care solely on the basis of his race is unconstitutional as it violates both Raymond Bullard's and John and Marilyn McLaughlin's equal protection rights. *See McLaughlin v. Pernsley,* 654 F.Supp. 1567, 1583 n. 30 (E.D.Pa.1987).

Equally, the use of race as a factor in determining long-term foster care placements is not constitutionally "necessary" where a governmental entity such as this Court can make placement decisions on an individualized basis. Foster care decisions made under these circumstances should not be decided by use of pernicious generalization but rather should be decided on individual merit. For this reason, it would be impermissible for this Court to use race as a factor in determining whether it should return Raymond Bullard to the custody of his former foster parents, John and Marilyn McLaughlin, or whether it should maintain Raymond's current foster care placement. This Court, however, does recognize that it must determine whether foster parents, such as the McLaughlins, can adequately provide for a foster child's racial and cultural needs.[6]

### B. DUE PROCESS CLAIM

#### (1) *Findings of Fact*

With respect to plaintiffs' due process claim, the Court finds as follows:

Neither the Department nor the CSS provided plaintiffs, as required by Pennsylvania law, with 15 days written notice of the

---

**6.** A part of this examination would include an inquiry into whether a prospective couple could instill and foster in a child, such as Raymond, a positive sense of racial identity. Other factors such as whether prospective foster parents live in an integrated neighborhood or would send the foster child to an integrated school, etc., should also be examined.

decision to move Raymond Bullard to a new foster home nor of their right to appeal that decision to a state administrative agency, *to wit*, the Commonwealth of Pennsylvania Department of Public Welfare, *see* 55 Pa.Code § 3700.73, within 15 days of receiving such notice.[7]

The DHS admits that the "CSS did not provide the McLaughlins with 15 days' written notice of the decision to move Raymond [Bullard] to a new foster home nor of their right to appeal that decision to a state administrative agency within 15 days of receiving such notice." Defendants' Answer to Plaintiffs' Complaint, at p. 3 paragraph 18.[8]

*(2) Conclusions of Law*

■ To determine whether plaintiffs' due process rights were violated, this Court must first determine whether the plaintiffs have a liberty interest deserving the protection of the Fourteenth Amendment. While no state may "deprive any person of life, liberty, or property, without due process of law," it is well settled that only a limited range of interests fall within this provision. *See Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983).

Liberty interests, protected by the Fourteenth Amendment, may arise from two sources—the Due Process Clause and the laws of the States. *Id.* The plaintiffs do not argue that the liberty interest they claim—that is, the right to maintain custody of Raymond Bullard pending appeal of the Department's decision to relocate the child—sources from the Due Process Clause itself. In light of the Supreme Court's decision in *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed. 2d 14 (1977), such an argument by the

plaintiffs might have little force. *Cf. Brown v. County of San Joaquin*, 601 F.Supp. 653 (E.D.Calif.1985). However, this Court need not decide this particular legal issue because the plaintiffs have argued and this Court finds that Pennsylvania law creates a liberty interest in favor of the McLaughlins deserving Due Process Clause protection.

Because this liberty interest sources from 55 Pa.Code § 3700.73, examination of this regulation is in order. Title Section 3700.73, Title 55, Philadelphia Code provides as follows:

§ 3700.73 **Foster Parent Appeal of Child Relocation**

(a) Foster parents may appeal the relocation of a child from a foster family home except under the following conditions:

(1) the child has been with the foster family less than six months;

(2) the removal is initiated by the court;

(3) the removal is to return the child to his parents;

(4) the removal is to place the child for adoption; or

(5) an investigation of a report of alleged child abuse indicates the need for protective custody removal to protect the child from further serious physical or mental injury, sexual abuse, or serious physical neglect as defined in Chapter 3490 (relating to child protective services—child abuse).

(b) The FFCA shall inform foster parents in writing that they may appeal the relocation of a child in accordance with subsection (a) at least 15 days prior to the relocation of the child.

---

**7.** A summary of the Public Welfare Social Services Memorandum that contains the relevant regulation was delivered to the McLaughlins by CSS on April 25, 1984, eighteen (18) months prior to Raymond's removal. *See* Third–Party Defendant's Exhibit No. 1. The CSS' delivery of the Summary was not intended to and in fact did not satisfy the requirements of 55 Pa.Code § 3700.73; 55 Pa.Code § 3700.73 requires that foster parents receive timely notice at least fifteen (15) days prior to a proposed relocation decision.

**8.** The Department further admits that "the removal of a foster child from plaintiffs' home ... occurred without the written notice, required by state law, of plaintiffs' right to appeal the removal" in its Response to Plaintiffs' Renewed Motion for Preliminary Injunction, at page one, paragraph one. *See also* City Defendants' Proposed Findings of Fact and Conclusions of Law at page 4 ("Catholic Social Services failed to provide the required written notice of the McLaughlins' right to appeal the removal decision.").

(c) Foster parents who wish to appeal the relocation of a child must submit to the FFCA a written appeal to be post-marked no later than 15 days after the date of the notice of their right to appeal the child's relocation.

(d) Upon receipt of the foster parent's appeal, the FFCA shall date stamp the appeal and submit it to the Department's Office of Hearing and Appeals, P.O. Box 2675, Harrisburg, Pennsylvania 17120, within three working days.

(e) If a foster parent submits an appeal in accordance with subsection (c) and the foster parent has the right to appeal in accordance with subsection (a), the child must remain in the foster family home pending a decision on the appeal.

(f) All parties to an appeal of a child's relocation may be represented by an attorney or other representative.

Section 3700.73 of Title 55, Philadelphia Code, grants to "qualified" foster parents, such as plaintiffs, *see* 55 Pa.Code 3700.-73(a), fifteen (15) days prior notice of and the right to appeal a foster family care agency's decision to relocate a child from their foster family home. In the first instance, "qualified" foster parents may appeal the decision to relocate the child to the Commonwealth of Pennsylvania Department of Public Welfare's Office of Hearing and Appeals. 55 Pa.Code § 3700.73(d). Thereafter, judicial review is available in the Pennsylvania Commonwealth Court, *see* 2 Pa.C.S. § 702; 42 Pa.C.S. § 763, and then possibly in the Pennsylvania Supreme Court. *See* 42 Pa.C.S. § 724. *Cf.* 42 Pa.C.S. § 723. Moreover, if "qualified" foster parents, such as the plaintiffs, submit an appeal in accordance with subsection (c) of this regulation, subsection (e) commands that "the child *must* remain in the foster family home pending a decision on the appeal." 55 Pa.Code § 3700.73(e) (emphasis added).

Section 3700.73, Title 55, Philadelphia Code, goes considerably beyond providing simple procedural requirements for state actors to follow when they make foster care relocation decisions. *See Hewitt v. Helms*, 459 U.S. 460, 471–72, 103 S.Ct. 864,

871–72, 74 L.Ed.2d 675 (1983). This regulation uses language of an unmistakably mandatory character requiring that certain procedures "shall" or "must" be employed.

For example, subsection (b) of Section 3700.73 states that a foster family care agency (hereinafter "FFCA") "shall" inform foster parents that they may appeal a decision to relocate a foster child. Further, subsection (d) commands that an FFCA upon receipt of the foster parent's appeal "shall" date stamp the appeal and submit it to the Department's Office of Hearing and Appeals. Most significantly, subsection (e) of this regulation commands that if a foster parent submits an appeal in accordance with subsection (c) and the foster parent has the right to appeal in accordance with subsection (a), the child *"must"* remain in the foster family home pending a decision on the appeal.

This Court is persuaded, *see* 460 U.S. at 472, 103 S.Ct. at 871, that this use of explicitly mandatory language in connection with requiring specific substantive predicates demands the conclusion that the State has created a protected liberty interest.

That being the case, the plaintiffs then contend that they were and are entitled to receive at least the process due them under this State regulation. With this proposition, the Court agrees. The plaintiffs do not argue that the constitutional protection of the Fourteenth Amendment entitles them to receive more process than is provided to foster parents under this regulation.

Under this state regulation, the process due foster parents includes appropriate notice of and a right to appeal a FFCA's decision to relocate a foster child placed in their foster family home, such as Raymond Bullard. Foster parents who appeal pursuant to this regulation are entitled to at least the opportunity to reverse a foster family care agency's decision to relocate a foster child from their foster family home. Otherwise, this regulatory appeal would be meaningless.

Further, and primarily because of the commands contained in subsection (e), the process afforded by the regulation is due to

foster parents, such as the McLaughlins, before the actual deprivation takes place. *See McLaughlin v. Pernsley,* 654 F.Supp. 1567, 1577 & n. 21 (E.D.Pa.1987).

■ The McLaughlins, as this Court described above, did not receive any of these procedural rights entitled to them under this regulation by virtue of the Due Process Clause. Under these circumstances, this Court is obligated to find that the Department of Human Services' conduct violated plaintiffs' due process rights.[9]

### C. CONCLUSION

The conclusion that the McLaughlins will prevail on the merits of both their due process and equal protection claims is inescapable as the law and the facts are clearly in their favor.[10]

The Court will now examine the issue of irreparable harm.

## II. *Irreparable Harm*

This Court, in its Memorandum and Order of March 10, 1987, held that it could grant the equitable relief that plaintiffs seek—that is, an order directing the DHS to return Raymond Bullard to their foster

care—as a remedy to an established due process or equal protection violation. *See McLaughlin v. Pernsley,* 654 F.Supp. 1567, 1582–84 & nn. 29 & 30 (E.D.Pa.1987).[11] Of course, this Court could not grant this mandatory injunctive relief absent a finding that irreparable harm and injury would enure to the plaintiffs and to Raymond Bullard if the status quo is maintained.

The parties do not dispute that Raymond Bullard suffered greatly when he was precipitously removed from the McLaughlins' foster care on October 18, 1985. Raymond suffered a severe depression of childhood as a result of being removed from the McLaughlins' foster care. Despite their splendid efforts, Raymond has made some but really only marginal progress emotionally while in the Williams' foster care.

The psychiatric diagnosis of Raymond's depression has been confirmed recently by Raymond's present treating psychiatrist, Dr. Gregory Williams. Earlier, a panel of three eminent psychiatrists, concluded also that Raymond suffers from depression. Drs. Bazelon and Schechter, members of this panel, testified that the only meaningful way to assist Raymond Bullard in his fight to overcome his present depressed

---

**9.** The Court at this time declines to rule on the liability under 42 U.S.C. § 1983 of CSS to the plaintiffs. This issue can be better addressed at a later stage of this lawsuit.

**10.** At this time, the Court will address the claim of collateral estoppel that has been raised as a defense by the intervening and third-party defendants.

The intervening and third-party defendants argue that this Court, even if it were to find constitutional violations, should not address the placement issue presented in this case. These parties argue that this issue was litigated before Pennsylvania's Department of Public Welfare Secretary White. *See* Appeal of Rev. and Mrs. Willie Williams In re Foster Relocation of Raymond Bullard, No. 37–007 (Commonwealth of Pennsylvania, Department of Public Welfare, April 29, 1988). Defendants argue that plaintiffs should be precluded by virtue of the collateral estoppel doctrine from relitigating this issue in this court.

The defendants issue preclusion argument fails for several reasons. First, the plaintiffs did not participate in those prior state proceedings. Moreover, there is no evidence in the present record that establishes that the plaintiffs were "in privity" with the DHS during those proceed-

ings. Second, Secretary White applied Pennsylvania law in reaching his decision. This Court, however, applies federal law in deciding whether to grant the relief the plaintiffs request. Of particular concern in this regard is the fact that Secretary White used the generalization of racial match in reaching his placement decision. This Court will not and must not rely upon such a racial classification in reaching its result as this Court is convinced that reliance upon racial match when an individual assessment can take place is unconstitutional. This is precisely why the testimony of the intervening defendants' witness, Ms. J. Toni Oliver, in addition to being unpersuasive, is of little or no validity as a matter of constitutional law.

**11.** This Court earlier held that "the plaintiffs, as foster parents, have standing, as a matter of federal law, to raise the foster child's rights in a federal court." *McLaughlin v. Pernsley,* 654 F.Supp. 1567, 1582–84 (E.D.Pa.1987). As foster parents, the plaintiffs have "sufficient attributes of guardianship that their views on the rights of the child[ ] should ... be heard." *Id.* at 1584 (*quoting Smith v. Organization of Foster Families for Equality and Reform,* 431 U.S. 816, 841 n. 44, 97 S.Ct. 2094, 2108 n. 44, 53 L.Ed.2d 14 (1977)).

condition would be to return him to the McLaughlins' foster care and re-establish for him the most significant relationship in his life. If Raymond is not returned, these physicians explained that Raymond's potential ability to overcome his depression by return to the McLaughlins will be significantly diminished. In that event, it is virtually certain that Raymond will bear permanent emotional injury. It is this irreparable injury to Raymond that will occur by failing to act within a reasonable period of time that justifies this Court's granting mandatory injunctive relief.

Further, Dr. Schechter at the hearing testified that the return in this particular case is more compelling because Raymond suffers from a speech impediment, the precise source of this speech impediment not being particularly important. Dr. Schechter testified and the Court finds that Raymond's inability to express his emotional discomfort will operate actively to harm the child by exacerbating the undesirable aspects of his present depressed condition. Dr. Schechter further explained that excessive and perhaps uncontrolled agressive behavior and frequent episodes of periodic depression could result to Raymond if Raymond is not returned to the McLaughlins' care and if Raymond's inability to communicate effectively remains.

Thus, this Court finds that if Raymond is not returned to the McLaughlins, he clearly will suffer irreparable injury.

The harm to the McLaughlins is also irreparable in that they will lose their ability to care for Raymond if this Court denies the preliminary relief they seek. As time passes and Raymond is not returned to them, the possibility that he will return to their care becomes more remote. The McLaughlins would also suffer greatly knowing that Raymond's ability to enjoy his life fully would be compromised if the status quo is maintained. In fact, the McLaughlins realize that the failure to return Raymond to their care can be equated to the infliction of a positive harm.[12]

At this juncture, the Court will examine in more detail the medical testimony that relates to the foster child, Raymond Bullard.

### 1. THE MEDICAL TESTIMONY

The Court finds the following medical testimony convincing as it supports the Court's conclusion that Raymond Bullard will suffer irreparable harm if he is not returned to the McLaughlins:

#### (a) *The Bazelon Evaluation*

At an earlier point in this litigation, Eileen Bazelon, M.D., a child psychiatrist, was mutually chosen by the Department and the McLaughlins to conduct a professional evaluation as to how Raymond Bullard would be affected psychologically by a return to the McLaughlins. Dr. Bazelon, after reviewing reports of earlier evaluations and conducting her own evaluation of Raymond Bullard in a report dated November 24, 1986, stated: "Raymond Bullard suffered a clinical depression of childhood since leaving the McLaughlins," and that "... the childhood depression he is now experiencing ... has significantly interfered with his current functioning and level of achievement...." Dr. Bazelon further related that it was her professional opinion that, "Raymond Bullard should return to the McLaughlins' home.... If he is not returned ... he will continue to be clinically depressed and speech will continue to be delayed."

Dr. Bazelon, during this earlier evaluation, saw Raymond with both foster families in separate sessions. During the session with the Williams family, the Williamses told her that Raymond was a sad child and seemed withdrawn. R.T. 113. Dr. Bazelon observed Raymond to be a quiet child who used few words and engaged in little interaction with the Williams family despite encouragement to do so. R.T. 109.

During the session with the McLaughlins, however, Raymond behaved differently. At that time, Raymond had not seen

---

12. The City has stipulated that the plaintiffs will suffer irreparable harm if the equitable relief requested is not granted. *See* Municipal Defendants' Response to Plaintiffs' Renewed Motion for Preliminary Injunction.

the McLaughlins for more than a year. Nonetheless, he recognized them. At first, he simply looked at them, went to a corner of the room, turned his back on them and began sucking his thumb. He was silent for several minutes but seemed upset. R.T. 110. Dr. Bazelon described what happened next:

> "At that point in time, Mrs. McLaughlin asked me if she could approach Raymond and possibly pick him up and I said yes she could.
>
> I have a rocking chair in my office and she took him on her lap. He did not protest in any way and she held him and started to sing a lullaby to him and he nestled his head on her shoulder and pressed his body against her and they sat there for several minutes."

R.T. 111.

Thereafter, Dr. Bazelon observed Raymond become quite animated in his interaction with the McLaughlins. She observed him using full, if simple, sentences with the McLaughlins, whereas he had used only single words at most with the Williamses. R.T. 112. As Dr. Bazelon described it, "It was as if someone had turned on the light switch and a light had come on inside of him" when he was with the McLaughlins. *Id.*

After observing Raymond's behavior with, and his reaction to, the McLaughlins, Dr. Bazelon reached the conclusion described above that Raymond had suffered from a clinical depression of childhood since leaving the McLaughlin home.

### (b) *The Panel Evaluation*

In April, May and June, 1987, a team of three eminent psychiatrists performed an extensive psychiatric evaluation of Raymond. The team consisted of Dr. Bazelon, Henry Eisner, M.D. and Marshall Schechter, M.D. The panel was composed of one member selected by the plaintiffs in this matter, one member selected by the City and a third member selected by the first two members. Drs. Schechter and Bazelon testified at the hearing as to the observations and conclusions that they independently reached and as to those conclusions that the the panel of physicians reached as a team.[13]

Between April and June, 1987, these three physicians, as a team, conducted the following inquiry:

(1) Observation of Raymond by the full team in each foster home.

(2) Observation of Raymond by full team with each family at the Child Guidance Development Center in Philadelphia.

(3) Observation of Raymond in his current nursery school.

(4) Review by the team of available social history and medical records.

(5) Updated psychological and neurological testing.

(6) Interviews with Raymond Bullard's pediatricians.[14]

At the conclusion of their evaluation, the panel unanimously diagnosed Raymond Bullard as suffering from a clinical depression. R.T. 126. Dr. Bazelon succinctly related the panel's evaluation of Raymond's condition:

> "We felt that he was suffering from the effects of having lost his relationship with the McLaughlins and that he had gone from being a happy, delightful, playful child into being passive, somewhat restricted in his expression of emotion, somewhat reserved, having difficulty initiating activity on his own, and also that he was suffering a speech delay." R.T. 126.

The panel also observed the following symptoms in Raymond Bullard that are consistent with a finding of severe childhood depression—that is, excessive aggres-

---

**13.** Dr. Schechter is a licensed child psychiatrist with 40 years experience. Dr. Schechter has performed hundreds of placement and/or placement-related evaluations of children. Dr. Bazelon, also a licensed adult and child psychiatrist, has 17 years professional experience, including her psychiatric residency. Dr. Bazelon is presently an assistant professor of psychiatry at Medical College of Pennsylvania which is located in Philadelphia. Dr. Bazelon has experience in making child placement evaluations.

**14.** This was the most extensive evaluation that Dr. Bazelon had ever participated in.

sion and preoccupation with death. *See* R.T. 126–27. The panel also unanimously recommended that it was in Raymond Bullard's best interests if he were returned to the McLaughlins' foster care.

### (c) *The Schechter & Bazelon Testimony*

Aside from the team's unanimous recommendation that Raymond return to the McLaughlins' foster care, Drs. Schechter and Bazelon independently recommended this course of action at the hearing to treat properly Raymond's condition. These physicians base their recommendation upon the fact that despite the lengthy separation, Raymond's emotional and psychological ties to the McLaughlins have not been extinguished but remain very strong. These physicians testified, and the Court finds, that the McLaughlins had become, in effect, Raymond's psychological parents. These physicians rejected, as an inadequate treatment alternative, the proposal that Raymond Bullard remain in the Williams home and receive psychotherapy treatment for his depression.

Drs. Schechter and Bazelon testified that their conclusions were in no way based upon nor influenced by any agreement that was entered into between any of the parties in this litigation. This Court is convinced without doubt that the representations that Drs. Schechter and Bazelon made concerning any pre-evaluation agreement between the parties are true. Since this factual determination depends in large part upon the credibility of these physicians, this Court is uniquely situated to pass upon this issue.

Both doctors before testifying at the hearing reviewed the most recent observations and prior testimony of Raymond's present treating psychiatrist, Dr. Gregory Williams. Both physicians agreed that Dr. Williams' observations confirm their earlier diagnosis and in no way change their recommendation that Raymond Bullard return to the McLaughlins' foster care.

**15.** Dr. Williams began treating Raymond in August, 1987. Dr. Williams does not consider himself an expert on child placement and was not

### (d) *Dr. Gregory Williams*

Finally, the Court considered persuasive the testimony of Dr. Gregory Williams.[15] Dr. Williams confirmed the evaluation team's depression diagnosis. Dr. Williams testified that Raymond suffers from a severe depression of childhood. Dr. Williams offered no opinion as to what placement would be consistent with Raymond Bullard's best interests. Dr. Williams testified that he had no professional objection to Raymond Bullard returning to the McLaughlin home while undergoing psychotherapy.

Dr. Williams also informed the Court that because Raymond's depression is severe, the ability of any foster couple to provide for Raymond Bullard's racial and cultural needs was less important than other more pressing medical concerns. Nevertheless, this Court finds that John and Marilyn McLaughlin can adequately provide for Raymond Bullard's racial and cultural needs if he is returned to their foster care. The McLaughlins, as this Court has found above, have and will provide Raymond with a safe, stable and secure home. Further, this Court has determined that John and Marilyn McLaughlin will provide to Raymond the affection and care that he needs in order to grow up to be a responsible young man in our society.

Moreover, the McLaughlins live in a racially integrated neighborhood and stated that they would ensure that Raymond would attend a racially integrated school that is located near their present home.

In addition to encouraging Raymond, as he develops, to inquire fully about his racial heritage, the McLaughlins testified that they would encourage Raymond to develop ongoing significant relationships with both his black and white peers.

This Court is satisfied that Raymond if he is provided with this type of environment and emotional support upon his return to the McLaughlins' foster care, Raymond will have every opportunity to develop a positive sense of racial identity.

offered or qualified as an expert on that subject matter.

When one also considers that the McLaughlins would be willing to allow Raymond to maintain some regular contact with the Williams family, this goal can and will be realized.

## 2. CONCLUSION

The clear and convincing medical evidence presented by the plaintiffs compels this Court to conclude not only that Raymond Bullard's best interests will be served if he is returned to the McLaughlins' foster care but that he and the McLaughlins will suffer irreparable injury if this custodial decision is not effected.

## III. *Harm to Other Parties*

In determining whether to grant the requested mandatory injunctive relief, this Court must consider whether the relevant third parties in this case, Raymond Bullard and the Williams family, will be harmed if the relief plaintiffs requested is granted.

The evidence in the record is clear that Raymond Bullard will benefit from a return to the McLaughlins and will be harmed if this return is not effected. The evidence shows that neither psychotherapy nor the passage of time has undone the trauma that Raymond Bullard suffered during his abrupt removal from the McLaughlins. In short, a return to the McLaughlins is not only in Raymond's best interests but it offers Raymond his only real chance to be made whole.

Unfortunately, no decision to return Raymond to the McLaughlins can avoid harm to the Williams family. The Williams family has provided Raymond with superb foster care and there can be no question that the Williams family has grown extremely fond of him. Nevertheless, the Williams' needs must be balanced against those of Raymond and of the McLaughlins. The balance of equities in this case strongly favor the return of Raymond to the McLaughlins.

## IV. *The Public Interest*

Removing children from their psychological parents merely because the parties happen to be of different race can never serve the public interest. Racial discrimination violates "deeply and widely accepted views of elementary justice" and is contrary to "a most fundamental national public policy." *Bob Jones University v. United States,* 461 U.S. 574, 592–93, 103 S.Ct. 2017, 2029, 76 L.Ed.2d 157 (1983).

Deciding Raymond's placement, not on the basis of his race but on the quality of his relationships will advance the strong public interest in overcoming racial discrimination and will promote the goal that citizens be treated according to their individual human qualities.

## V. *Conclusion*

This Court has determined that the McLaughlins will likely succeed on the merits of their case. Moreover, this Court has determined that the McLaughlins and Raymond Bullard will be irreparably injured if the injunctive relief requested in this case is not granted. Further, this Court has determined that the need to grant the mandatory injunctive relief in this case clearly outweighs the harm that it might cause to the other interested parties, particularly here, the Williams family. Finally, this Court has determined that granting the relief in this case will advance the public interest.

As this Court previously stated, mandatory injunctive relief such as the relief sought in this case can only be granted when the facts and the law are clearly in favor of the moving party. Here, the McLaughlins have met this most stringent standard and this Court will grant their motion for a preliminary injunction. The Court requests that Dr. Eileen Bazelon submit forthwith on behalf of the plaintiffs and the City a plan by which to carry out the return of Raymond Bullard to the McLaughlins' foster care. Based upon the expert testimony presented at the hearing, this change should take place immediately but over a period of eight weeks. The plan should also provide that Raymond have some continued contact with the Williams family. The other particulars should be submitted by Dr. Bazelon to the Court

through the plaintiffs and the City for the Court's approval.

An appropriate Order follows.

## ORDER

AND NOW, this 23rd day of August, 1988, upon consideration of the plaintiffs' renewed motion for preliminary injunction (Docket Entry No. 42), municipal defendant's response to plaintiffs' motion for preliminary injunction (Docket Entry No. 46), answer of intervening defendants Willie and Elaine Williams to plaintiffs' renewed motion for preliminary injunction (Docket Entry No. 48), transcript of proceedings—5/3/88 (Docket Entry No. 54), transcript of proceedings—5/4/88 (Docket Entry No. 55), transcript of proceedings—5/5/88 (Docket Entry No. 56), plaintiffs' findings of fact and conclusions of law (Docket Entry No. 57), intervening defendants' proposed findings of fact and conclusions of law (Docket Entry No. 58), third-party defendants' request for findings of fact and conclusions of law (Docket Entry No. 59), city defendant's proposed findings of fact and conclusions of law (Docket Entry No. 60), plaintiffs' response to third-party defendants' proposed findings of fact and conclusions of law (Docket Entry No. 62), and in accordance with the foregoing Memorandum, it is hereby ORDERED that plaintiffs' renewed motion for preliminary injunction is GRANTED. This Court ORDERS the City of Philadelphia, Department of Human Services, to return Raymond Bullard to the foster care of John and Marilyn McLaughlin.

The Court further requests that Dr. Eileen Bazelon submit forthwith to the Court a plan by which the Department of Human Services will carry out the return of Raymond Bullard to the McLaughlins' foster care. Based upon the expert testimony presented at the hearing, this process of return should take place immediately but over a period of eight weeks. The plan should also provide that Raymond Bullard have some continued contact with the Williams family. The other particulars should be included in the plan submitted by

Dr. Bazelon to the Court for the Court's approval.

Finally, the Court requests that Raymond Bullard's present treating psychiatrist, Dr. Gregory Williams, assist Dr. Bazelon in overseeing the ordered change of custody.