v.

Joseph J. O'HARA; Wilma Allen; Dorothy Heltibrand; Virginia Allen; Dwain M. Hovis; Gary Stangler; Jeannie Oney; Ann Gulick; Gary Thurman; Dorothy Lavington; Rosalind Conner, Appellees.

No. 88–2224.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 10, 1989.

Decided June 23, 1989.

Rehearing and Rehearing En Banc Denied Sept. 6, 1989.

Ross H. Briggs, St. Louis, Mo., for appellants.

William E. Cornwell, Jefferson City, Mo., for appellees.

Before JOHN R. GIBSON and MAGILL, Circuit Judges, and WATERS,* Chief District Judge.

MAGILL, Circuit Judge.

Plaintiffs J.H.H. and S.C.H. are a white couple licensed by the State of Missouri to provide foster care. Plaintiffs filed suit under 42 U.S.C. § 1983 against eleven officials and employees of the Missouri Division of Family Services (the Division), claiming their right to equal protection was violated because a decision not to return two black foster children to the plaintiffs' home was based solely on race. The district court[1] dismissed plaintiffs' claims for money damages against the Division employees on grounds of qualified immunity. Because we find that plaintiffs' claim is not based on a clearly established constitutional right, we affirm.

---

* THE HONORABLE H. FRANKLIN WATERS, Chief United States District Judge for the Western District of Arkansas, sitting by designation.

1. The Honorable Clyde S. Cahill, United States District Judge for the Eastern District of Missouri.

## I.

### A. Facts

Plaintiffs have been licensed foster parents since 1969. In 1984, they held a provisional Foster Family Group Home license. In August 1984, plaintiffs' household included two natural children, two adopted children, and eight foster children placed by the Division. On August 13, two of the foster children in their care (siblings J.B. and T.B.) visited their natural mother. On that date, officials received a "hot line" report that J.B. had been physically abused. Pending an investigation of the alleged abuse, J.B. and T.B. were not returned to plaintiffs' custody. On August 17, two other foster children, siblings C.R. and L.R., were moved to a different foster home, apparently in accord with the Division's long-term placement plan for the two children. On August 23, at the direction of Joseph O'Hara, director of the Division, the four remaining foster children, R.T., A.T., J.W. and M.W., were removed from the plaintiffs' home. R.T. and A.T. were placed in the foster care of the J.'s, a black couple.

A juvenile officer of the St. Louis County Juvenile Court investigated the allegation of abuse, and found reason to suspect that physical abuse had occurred. The investigation never identified the perpetrator of the abuse.

On September 17, plaintiffs, through their attorney, voluntarily surrendered the Group Home license, and proposed that they be allowed to retain a Foster Home license. Plaintiffs also requested that R.T., A.T., J.W. and M.W. be returned to their care as early as possible and expressed their interest in adopting the four children.

On September 19, O'Hara approved the surrender of the Family Group Home license and the provisional retention of a Foster Family license permitting placement of two children in plaintiffs' home. O'Hara also wrote that J.W. and M.W., who were white, "will be returned to the [plaintiffs'] home for continued placement with a plan for adoption," and that R.T. and A.T. "will *not* be returned because a more appropriate placement has been located." The plaintiffs requested the Division to reconsider its placement plans for R.T. and A.T., and on October 19, O'Hara reiterated the Division's decision on the grounds that placement of R.T. and A.T. with plaintiffs was "not appropriate." O'Hara reported that the decision was based on the Division's conclusion that the incident of reported child abuse was "the result of stress due to heavy continuous child care responsibilities" in plaintiffs' home, and that "child abuse or neglect would likely reoccur if all the children were to remain in the home."

Thereafter, plaintiffs appealed the decision not to return A.T. and R.T. to their home through the Division's five-step foster parent grievance process.

### B. Grievance Process

After a step-one conference between the plaintiffs and defendants Wilma Allen and Dorothy Lavington (both social service supervisors with the Division), Allen denied plaintiffs' request based on (1) the investigation of the August 13, 1984 child abuse report, which found "reason to suspect" that the allegations of child abuse were true; (2) the placement of J.W. and M.W. in plaintiffs' home in October 1984, under the provisional license for two children; and (3) the "agency's plan for [R.T. and A.T.] for them to remain in their present foster home."

At step two, defendant Dorothy Heltibrand, a "Social Service Supervisor III," denied the plaintiffs' grievance. Because their provisional Foster Family license permitted placement of no more than two children, and J.W. and M.W. were already placed in plaintiffs' home, Heltibrand concluded that "the replacement of the [T.] children in your home is not possible."

At step three, the Division conducted a hearing to review plaintiffs' grievance. By letter of February 27, 1985, defendant Virginia Allen, county director of the Division, summarized the hearing and delivered the Division's decision denying plaintiffs' grievance. Allen's letter reports agreement by all parties that A.T. and R.T. were removed

from plaintiffs' home following the child abuse report, and that the perpetrator of the abuse was still unknown. Christine Schmitt, an adoption specialist with the Division, reported that plaintiffs were doing "an outstanding job" in handling the adoption of J.W. Christine Keefer, a juvenile court officer, opined that plaintiffs provided "an outstanding foster home" and that a return to their home with a plan for adoption would be in the best interests of R.T. and A.T. Lynn Phelps, a Division licensing worker, considered plaintiffs' home "an exceptional home and resource for children." Dorothy Lavington, the plaintiffs' foster case worker, described plaintiffs as "a warm, nurturing family," with "strong bonds" between A.T., R.T., and plaintiffs' family, and testified that when R.T. and A.T. were removed, it was the Division's intent to return them to the plaintiffs' home. At the time of the hearing, however, Lavington believed that the foster family with whom the T. children were placed after removal from the plaintiffs' home "will be better able to meet the children's needs as foster parents because they are of the same race." Three foster parents also testified, including two black foster mothers who stated that they had a close relationship with plaintiffs' family and provided support, especially in the area of race and culture, for the plaintiffs' foster children. Allen concluded her summary of the hearing by observing that "[a]ll of the other witnesses were unanimous in their overwhelming support and approval of the unique, warm, loving, positive, healthy parenting provided for all of the children in your home."

Allen indicated that plaintiffs' witnesses and the Division's workers and supervisors who testified "were unanimous in their praise for the excellent care you have provided to your own, adoptive and foster children through the years," and that the "agency's assessment of your capabilities as loving and responsible parents" was reflected in the fact that plaintiffs adopted children, had one child placed for adoption

(J.W.), and had one foster child (M.W.) for whom the plan may be adoption. Nonetheless, the Division decided that continued placement in the J.s' home would best meet the future needs of A.T. and R.T. The Division's plan for the children—eventual reunification with the natural father— would best be met by continued placement with the J.s, as they were "able to provide both cultural and religious experiences to prepare the children for this event."

At step four, defendant Dwain Hovis, acting deputy director of the Division, denied plaintiffs' grievance. Hovis found that the decision to remove A.T. and R.T. from plaintiffs' home was based "upon substantial evidence that the best interests of the children would not be served if they remained in your care." Hovis indicated that since the removal of the children from plaintiffs' home, the Division's case plan for the children had changed from one of placement for adoption to eventual reunification with their natural father. Thus, the "racial and cultural needs of the children" became "a primary consideration" after the change in the placement plan and replacement in the plaintiffs' home would not be in the children's best interests.

On April 30, 1985, Gary Stangler, the Division's acting director, denied plaintiffs' grievance at the fifth and final step of the grievance procedure.[2] Stangler concluded that removal of A.T. and R.T. from the defendants' home was appropriate and in their best interest, and that "the children should be in a home that has a similar cultural and ethnic background to their own."

### C. District Court

On January 27, 1987, plaintiffs filed suit for compensatory and punitive damages and injunctive and declaratory relief. Plaintiffs alleged that the Division's decision not to return A.T. and R.T. to their home was made pursuant to a Division policy mandating that minority children be placed with families of similar racial or

---

**2.** Under Mo.Rev.Stat. § 536.100, plaintiffs could have pursued judicial review of the Division's final decision denying their grievance.

ethnic characteristics. They alleged further that the individual defendant's actions taken pursuant to this policy violated their constitutional rights to equal protection.

After substantial discovery, defendants filed a motion for summary judgment. The district court ruled that plaintiffs failed to show that defendants acted in "bad faith" and thus defendants were entitled to qualified immunity on the claim for money damages. The district court found "good faith" on the part of the defendants in plaintiffs' admission that "defendants acted pursuant to Missouri Division of Family Services regulations." The district court granted defendants' motion for summary judgment, but dismissed the case without prejudice, giving plaintiffs thirty days in which to reopen the case in pursuit of their equitable remedies.

## II.

Plaintiffs challenge the Division's "Guidelines for Placement Resource Selection" which they characterize as a "formal policy of segregation in foster care." They allege that, in acting pursuant to this Division policy, defendants denied their requests for care and custody of A.T. and R.T. because plaintiffs were white and the girls were black. We first look at the legal standard for reviewing claims of qualified immunity and then address plaintiffs' contentions.

### A. Qualified Immunity

The defense of qualified immunity represents an accommodation of competing social interests whereby officials who knowingly violate the law are held accountable while officials who reasonably perform their discretionary duties may act without the fear of a lawsuit imposing personal liability. *Arcoren v. Peters*, 829 F.2d 671, 673 (8th Cir.1987) (en banc). To overcome

a defense of qualified immunity, plaintiffs must establish that the "legal norms allegedly violated by the defendants were clearly established at the time of the challenged actions * * *." *Boswell v. Sherburne County*, 849 F.2d 1117, 1120 (8th Cir.1988) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985)). To determine this "purely legal question," the courts (1) consider what specific conduct is complained of, and (2) look to statutory and case precedent and well-established general principles of law. *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 3022, 82 L.Ed.2d 139 (1984) (Brennan, J., concurring); *Myers v. Morris*, 810 F.2d 1437, 1459 (8th Cir.1987). In determining whether the legal right at issue is "clearly established," this circuit applies a flexible standard, requiring "some, but not precise factual correspondence" with precedent, and demanding that officials apply general, well-developed legal principles. *Lappe v. Loeffelholz*, 815 F.2d 1173, 1177 (8th Cir. 1987).

### B. Foster Home Criteria

Plaintiffs' facial challenge is directed to the "Guidelines for Placement Resources Selection" published by the Division as part of its Alternative Care Handbook, which took effect on February 1, 1983. Guideline No. 3 includes, as one of the issues to be considered in selecting a particular foster home:

> The ability of the foster family to preserve the child's racial, cultural, ethnic, and religious heritage. In most cases, every attempt must be made to match the child with a foster family with the same racial, cultural, ethnic, and religious background.

A summary statement of the standard appearing in the Guidelines states: "Minority children shall be placed with families of similar racial and ethnic characteristics."[3]

---

**3.** The Guidelines at issue contained six "Issues to be Considered in Selecting a Particular Foster Home:"

a. Proximity of the foster home to the child's family in order to facilitate visitation and reunification.

b. The extent to which the foster family can accept the child's relationship with his family and can deal adequately with situations which may arise from that relationship.

c. The ability of the foster family to preserve the child's racial, cultural, ethnic, and religious heritage. In most cases, every at-

Plaintiffs argue that the Equal Protection Clause bars discrimination solely on the basis of race. They point to *Palmore v. Sidoti,* 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984) as clearly established precedent, applicable to the defendants' conduct in the present case. In *Palmore,* the Supreme Court held that a natural mother's custody of her child could not be divested by a court order based solely on the perceived racial animus the child would encounter because the mother had married a man of a different race. Plaintiffs contend that *Palmore* established that "the consideration of race plays no role whatsoever in the regulation of family and domestic relationships." Plaintiffs find a factual correspondence between *Palmore* and the instant case in the State's common policy objective: in foster care placement determinations, as in custody determinations, the standard applied is the best interests of the child.

Plaintiffs find further support in *McLaughlin v. Pernsley,* 693 F.Supp. 318 (E.D.Pa.1988). In *McLaughlin,* the court preliminarily enjoined removal of a black foster child from white foster parents and placement of the child with black foster parents, where the removal decision was solely based on race and pursuant to a policy of same-race placement. Although *McLaughlin* was decided well after the challenged actions in the present case took place, plaintiffs note that the *McLaughlin* court reached its conclusion based on its "plain observations" and general principles of equal protection jurisprudence. The implication is that, since the court was not "plowing new ground," the principles of equal protection clearly applied to foster care placement decisions and thus reasonable foster care decision makers in the defendants' place should have known that placement based on race was unconstitutional.

The Division argues that at the time they made the foster care placement decisions at issue in this case, there was no clearly established constitutional bar to the consideration of race as a factor in foster care placement. Defendants point out that no Missouri state cases or federal circuit court cases discuss if or how the race of the child or prospective foster parents ought to be considered in foster care placement decisions. They also point to precedent in custody and adoption decisions that race may be considered as a relevant factor in determining the best interests of a child. *Drummond v. Fulton County Department of Family and Children's Services,* 563 F.2d 1200, 1204–05 (5th Cir.1977); *Annotation: Race as a Factor in Adoption Proceedings,* 34 A.L.R. 4th 167 (1982). Defendants further argue that adoption or custody cases involve final decisions regarding permanent custody of a child, and therefore are not directly analogous to temporary foster care placement.

■ While the *McLaughlin* case and the instant case both involved application of a race-based foster care placement policy,[4]

---

tempt must be made to match the child with a foster family of the same racial, cultural, ethnic and religious background.

d. The extent to which the interests, strengths, and abilities of the foster family enable the family to relate to the child's needs, including his individual problems; age; interests; intelligence; moral and ethical development; family relationships; educational status; social adjustment; and plans for the future.

e. The extent to which the foster family can meet the needs of a sibling group, in order to avoid the separation of siblings.

f. Proximity of the foster home to specialized services or facilities which the child may need.

**4.** The district court apparently granted defendants' motion for qualified immunity on two grounds. First, the court observed that defendants acted pursuant to the Division's regulations and thus had not acted in bad faith. Second, the court noted that plaintiffs had "made conclusory allegations that defendants did not act in good faith."

An official's actions are not immunized because they were taken according to orders or regulations if the defendant still knew or should have known he was violating plaintiff's constitutional rights. *Patzner v. Burkett,* 779 F.2d 1363, 1371 (8th Cir.1985); *Putnam v. Gerloff,* 639 F.2d 415, 422–23 (8th Cir.1981). Following orders does not constitute a "good faith" defense against invidious racial discrimination.

As we indicate above, the appropriate inquiry, apart from any justification of following orders or regulations, is whether reasonable persons in the defendants' position should have known that

there are several important differences. In *McLaughlin*, the court found that the decision to *remove* a black foster child from the home of white foster parents was based solely on race. *McLaughlin*, 693 F.Supp. at 324. The court also recognized that "the goal of making an adequate long-term foster care placement that provides for a foster child's racial and cultural needs" was consistent with the best interests of the child which was, in turn, a compelling governmental interest for purposes of the Equal Protection Clause. The court rejected the categorical application of race, but did recognize that a proper placement decision included a determination whether foster parents could adequately provide for a child's racial and cultural needs. *Id.* When we take into account that *McLaughlin* was a suit for a preliminary injunction, and not an action for money damages under § 1983, we are further disinclined to read backward from the *McLaughlin* decision to the situation of Missouri government officials acting some four years earlier.

■ We decline to read *Palmore* as a broad proscription against the consideration of race in matters of child custody and foster care placement. The state court custody award reviewed in *Palmore* was based solely on race—the prospective social stigmatization the child would face from having a step-father of a different race. The Supreme Court held that "the effects of racial prejudice, however real, cannot justify a racial classification removing an infant child from the custody of his natural mother found to be an appropriate person to have such custody." *Palmore*, 466 U.S. at 434, 104 S.Ct. at 1882–83. *Palmore*'s holding that an otherwise fit natural parent may not be deprived of permanent custody based solely on race did not clearly establish that race may never be taken into account in determining the best interests of a child in a foster care placement decision. Even if the principle of the *Palmore* decision extended beyond its context of a custody determination and was applicable to decisions of temporary foster placement, at most the precedent establishes that race may not be the sole factor in determining the best interests of the child. Where, as here, the foster plan is ultimate reunification with their natural father, it would stand *Palmore* on its head to read it as a bar to the consideration of race in determining the best interests of these foster children.[5]

### III.

■ Under the unique circumstances of this case, consideration of race in a foster placement decision made pursuant to a regulation requiring that a child's racial and ethnic needs, among others, be taken into account is an insufficient basis for imposing liability. The constitutional standards for consideration of the racial, ethnic, or cultural needs of a child in foster placement were not so clearly established in 1984 that defendants should be forced to defend their decision in these damage suits.

Accordingly, the judgment of the district court dismissing the claims for money damages is affirmed.

their conduct violated clearly established constitutional rights. *See Myers v. Morris*, 810 F.2d at 1458–59.

**5.** Plaintiffs argue that the Division's reunification plan, as well as the other reasons cited for its placement decision, are pretextual; thus, defendants have the burden of rebutting the claim of pretext and establishing that race alone was not determinative. *See, e.g., Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). However, we need not engage in a mixed motive analysis, given our holding that the defendants' actions pursuant to the Division's Guidelines for foster placement did not violate any clearly established constitutional rights of prospective foster parents.